762 F.2d 1522
 18 Fed. R. Evid. Serv. 757
 UNITED STATES of America, Plaintiff-Appellee,
v.
Philip WEINSTEIN "Dr. Philip Adamelli", Wilhelmina Harich
Weinstein, Solomon Richman, a/k/a "Sol" a/k/a
"Silver Fox", Robert "Bobby" Falvo,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
Stanley KOWITT, Defendant-Appellant.
 Nos. 83-5260, 83-5570.
 United States Court of Appeals,
Eleventh Circuit.
 June 12, 1985.
 
 Philip Weinstein and Wilhelmina Harich Weinstein, pro se.
 David R. Mackenzie P.A., Lauderhill, Fla., Harvey M. Stone, New York City, for Falvo.
 Drew Neville, B.J. Rothbaum, Jr., Oklahoma City, Okl., Richard H. Dolan, New York City, for Richman.
 Fine, Jacobson, Block, Klein, Colan & Simon, P.A., Irwin J. Block, Theodore Klein, Miami, Fla., for Kowitt.
 Gloria C. Phares, Washington, D.C., for U.S.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HILL, FAY and SMITH*, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 This appeal addresses two separate criminal actions joined at trial and consolidated for purposes of oral argument on appeal. For clarity and efficiency we address both actions in one opinion, setting out a separate disposition as to each appellant.
 
 I. INTRODUCTION
 
 2
 Appellants herein, Philip Weinstein, Wilhelmina Harich Weinstein,[1] Solomon Richman, Robert Falvo, and Stanley Kowitt (hereinafter and collectively, "appellants"), were convicted by jury trial in the United States District Court for the Southern District of Florida of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-68 (1982) ("RICO"), and of one or more counts of mail or wire fraud in violation of 18 U.S.C. Secs. 1341-1343 (1982). Each appellant appeals his or her conviction, alleging insufficient evidence to support prosecution under RICO. A number of evidentiary, constitutional, and procedural grounds of error are also raised.[2]
 
 
 3
 The crime which the government sought to prove was a simple one, a conspiracy to defraud pharmaceutical manufacturers by misrepresentations made through use of interstate mail and wire transmissions. The case is complicated, however, by the context in which this crime took place, the so-called diversion market of the American pharmaceutical industry. An understanding of the case therefore requires an understanding of diversion and its role in the marketing of pharmaceuticals in this country.
 
 II. FACTUAL BACKGROUND
 
 4
 A. Diversion In the American Pharmaceutical Industry
 
 
 5
 The Robinson Patman Act, 15 U.S.C. Sec. 13 et seq. (1982), prohibits anticompetitive discrimination in the pricing of goods sold for use, consumption or resale within the United States. An exception to the Act allows discriminatory prices for sales to nonprofit organizations. By its terms, the Act does not cover sales of goods for export.
 
 
 6
 In response to the Act, pharmaceutical manufacturers maintain a bifurcated pricing structure. One price is quoted for drugs sold to domestic wholesalers for resale in the United States. A much lower price is quoted for sales to exporters and nonprofit organizations. Pharmaceutical manufacturers thus discount products sold to exporters and nonprofit organizations. In most cases, the pharmaceutical products so sold are exported for resale in foreign countries or are used by nonprofit organizations for charitable purposes. Occasionally, however, exporters or nonprofit organizations may purchase a surplus of pharmaceutical products and later seek to resell that surplus in the domestic market. Because Robinson Patman only prohibits discriminatory pricing with anticompetitive effect, it is contended that it does not apply to such resales; no issue is raised as to that position. Notably, resale under these circumstances is also at a significant advantage. Nonprofit and export organizations can, because of the low price at which they were able to obtain the products, undercut the domestic prices pharmaceutical manufacturers offer on their own goods. This is the diversion market. It is a significant source of supply for many discount pharmacies and hospitals throughout the nation.
 
 
 7
 Understandably, diversion is unpopular with pharmaceutical manufacturers. While there was testimony in this case that in many instances pharmaceutical manufacturers used nonprofit and export organizations as a "dumping-ground" for pharmaceutical products nearing expiration, it was clear that many pharmaceutical houses actively seek to prevent diversion of products sold to export and nonprofit organizations. Some companies, in fact, go so far as to maintain investigators whose sole function is to trace sources of diversion supply.
 
 
 8
 These facts inform our disposition of the case. They are not, however, ultimately material to our decision. The financial motives a pharmaceutical manufacturer may have to favor or disfavor diversion are a matter of company policy. Diversion, whether boon or bane to the pharmaceutical industry, is not contended to be illegal as a matter of federal law.
 
 B. The Conspiracy Scenario
 
 9
 While it represents no illegality in itself, the diversion industry clearly presents unique opportunities for the development of fraudulent practices. The appellants, most of whom were established diverters, were convicted of using the interstate mail and wires to misrepresent themselves to pharmaceutical manufacturers as nonprofit or export organizations in order to obtain pharmaceuticals. That mail and wire fraud is the crime with which this appeal is concerned. We turn to the proof put on by the government at trial.
 
 
 10
 In May, 1975, John Berkey, a commodities broker, was authorized to establish an American branch of Opus Christi, a legitimate, nondenominational, charitable organization headquartered in Rome, Italy and dedicated to the distribution of medicines and foodstuffs to developing countries. Berkey registered Opus Christi as a nonprofit corporation in the District of Columbia and opened offices in the Watergate complex. Uneducated in the pharmaceutical business, Berkey contacted David Pollard, another commodities broker, and indicated to Pollard that, through Opus Christi's status as a charitable organization, Berkey would be able to acquire pharmaceutical products at preferential prices. Berkey merely required expertise as to which pharmaceutical products to purchase and at what prices. Pollard, responding to Berkey's request, contacted Philip Weinstein, Peter Fixler, and Lionel Harris, parties whom Pollard felt would be interested in Berkey's proposition because of their acquaintance with the diversion industry. Weinstein, Fixler and Harris, in response to Pollard's information, formed American Medicinal International, Ltd. ("AMI") as an outlet for the sale in the diversion market of pharmaceutical products obtained by Berkey through Opus Christi. Berkey, Pollard, Weinstein, Fixler, and Harris agreed to share the profits of the pharmaceutical diversion among themselves. These events occurred between May and November, 1975.
 
 
 11
 In November, 1975, (then) Wilhelmina Harich joined AMI as a secretary. Over the course of time her involvement with the company apparently increased until she became Weinstein's de facto partner.
 
 
 12
 At trial, the government sought to prove that, beginning in July, 1975, Berkey, at the behest of AMI, began soliciting pharmaceutical products from manufacturers, purportedly on behalf of Opus Christi. He sent a form letter through the mail to approximately twenty companies and represented that Opus Christi, a charitable organization, would export all merchandise obtained from manufacturers and that this merchandise was to be used in the charitable undertakings of the organization. Upon certain of the manufacturers' further inquiries about the nature of the charity, Berkey provided, via the U.S. mail, misrepresentative documentation about Opus Christi America.
 
 
 13
 At approximately the same point in time, Lionel Harris, one of the principals of AMI, introduced Peter Fixler and Philip Weinstein to Stanley Kowitt, an established diverter of pharmaceutical products in southern Florida. At that time Mr. Kowitt owned and operated American Drug Brokers, later renamed Majestic Sales, Inc. Mr. Kowitt would soon come to purchase the substantial majority of all pharmaceuticals diverted through Opus Christi to AMI.
 
 
 14
 The government sought to prove at trial that, once these entities and characters were in place, Kowitt would place an order with AMI directing delivery of pharmaceutical products be made to Majestic Sales. David Pollard would then telex or mail this information to John Berkey. Additionally, the order information would be typed onto an AMI purchase order and sent to Berkey. Berkey would then prepare an Opus Christi purchase order for the benefit of the manufacturer and direct that the manufacturer deliver the merchandise to a specified warehouse. The merchandise would then be shipped by truck or air to Florida, either to Weinstein at AMI or directly to Kowitt at Majestic Sales. Payment for these transactions was demanded upon delivery by the manufacturers. Initially, the principals of AMI advanced money to Berkey who, prior to delivery, paid the manufacturer. Upon delivery of the merchandise to Majestic Sales, Kowitt would issue a check to AMI which would be deposited immediately. Weinstein would withdraw cash sufficient to pay Berkey and Pollard their respective shares and Pollard or Weinstein would then fly to Washington to deliver Berkey's share. Later cash flow contributions were obtained from another appellant, Robert Falvo, in return for 25% of Berkey's share in Opus Christi. Falvo also subsequently obtained 50% of Pollard's income from Berkey as remuneration for similar financing.
 
 
 15
 By the end of 1975, Pollard and Fixler had dropped out of the diversion scheme. As a consequence, the operation was simplified. Kowitt would transmit Majestic Sales purchase orders directly to AMI. AMI and the Weinsteins dealt with Berkey at Opus Christi, who in turn dealt with the manufacturers.
 
 
 16
 In early 1976, certain manufacturers became aware that merchandise supplied to Opus Christi was appearing in the domestic market. In response to a perceived reluctance on the part of these manufacturers to deal with Opus Christi, John Berkey arranged to do business with a second charitable organization, Inter-Church Medical Assistance ("IMA"). Like Opus Christi, IMA was a well-known and well-regarded umbrella organization acting on behalf of protestant churches in the solicitation of pharmaceutical supplies and the distribution of those supplies to sponsored medical missions in developing nations. Berkey began to use IMA as a purchasing agent on behalf of Opus Christi. With this advent, the purchases were made through purchase orders by Majestic Sales and AMI to Opus Christi. Opus Christi then sent its purchase orders to IMA. IMA in turn prepared purchase orders for the manufacturers. This procedure continued until pharmaceutical companies began to make inquiries at IMA about pharmaceutical products purchased by IMA for Opus Christi which were later returned for refund to the manufacturers from merchants in the United States.
 
 
 17
 In June, 1976, a new charitable organization, the Church of God World Missions, Inc. ("Church of God"), was established with offices and a warehouse in Alexandria, Virginia. The government sought to prove that Church of God was a continuation of Opus Christi under a new name. The Church of God warehouse was rented by Opus Christi; the solicitation letters bearing the Church of God logo were Opus Christi letters that Berkey and assistants altered by changing names and enclosing different brochures; furthermore, the day-to-day business of the Church of God was handled by the Weinsteins at AMI. The organization set up a Church of God checking account, drawn on a Virginia bank, which was maintained by AMI. Evidence establishes that Philip Weinstein conducted the Church of God activities, and in doing so adopted the name "Dr. Philip Adamelli."
 
 
 18
 Contemporaneously with these activities, David Pollard became acquainted with Solomon Richman, a business associate of Robert Falvo. It was Falvo's opinion that Richman, who was the director of a Brussels company, S.P.R.L. GABAR ("GABAR"), would be well suited to handle distribution of pharmaceuticals acquired through Opus Christi. Subsequently, GABAR was used as an export front in continuation of the diversion scheme. Weinstein, on behalf of GABAR, would solicit merchandise from pharmaceutical companies at export prices for sale overseas. Weinstein referred to GABAR as an "associate firm" of AMI. In February, 1977, one of the manufacturers with whom Opus Christi and the other charitable organizations had dealt, Wyeth Company, notified Richman and GABAR that it would not complete GABAR's order because products shipped to GABAR for sale in Zaire had been found in the United States. Richman assured Wyeth that sales made to GABAR were legitimately for resale in Zaire. In March, 1977, Richman visited AMI in Miami and inspected Philip Weinstein's operation. In June, 1977, Richman authored a letter to Weinstein complaining of Weinstein's indiscretion in conducting the diversion enterprise.
 
 
 19
 This synopsis of evidence at trial establishes the nature of the conspiracy sought to be proved by the government. John Berkey, purportedly acting under the auspices of legitimate charitable organizations, would obtain pharmaceutical products at preferential prices. Through the medium of AMI and Philip Weinstein, Wilhelmina Weinstein (nee Wilhelmina Harich), Peter Fixler and Lionel Harris, these pharmaceutical products would be diverted for resale in the United States. Financing for this arrangement came initially from the principals of AMI and, at a later time, from Robert Falvo. The ultimate domestic resale was accomplished through Majestic Sales and Stanley Kowitt, or through GABAR and Solomon Richman. Interstate mails and wires were used to commit fraud upon manufacturers in furtherance of this conspiracy.
 
 C. Procedural Background
 
 20
 A superseding seven-count indictment was filed in the Southern District of Florida charging all appellants with conspiracy to violate RICO, and one or more overt acts of wire fraud or mail fraud supporting the conspiracy charge. Trial by jury was held in the Southern District of Florida before Judge Norman Roettger, Jr. The trial lasted approximately one month and generated a transcript over 4,000 pages in length. Appellants Philip Weinstein, Solomon Richman and Robert Falvo were each sentenced to imprisonment for six years and a $25,000 fine. Appellant Stanley Kowitt was sentenced to imprisonment for five years and a $25,000 fine. Appellant Wilhelmina Harich Weinstein was sentenced to imprisonment for three years. All appellants appeal their convictions alleging a total of 32 grounds of error.[3] For ease of reference we have grouped these claims thematically. Part III of this opinion examines the validity of the evidence at trial. Part IV addresses the sufficiency of the evidence as to each appellant. Part V examines claimed errors in the indictment. Part VI considers issues of misjoinder and severance. Part VII examines claimed prosecutorial misconduct. Part VIII summarizes our holding in this case.
 
 III. THE VALIDITY OF THE EVIDENCE
 A. Fourth Amendment Challenges
 
 21
 Appellants Philip Weinstein and Stanley Kowitt challenge the validity of the evidence offered against them on the basis of claimed fourth amendment violations in FBI searches of their respective places of business. We examine these claims as to each appellant.
 
 
 22
 1. Philip Weinstein.
 
 
 23
 On July 13, 1977, FBI agents executed a search warrant at the premises of American Medicinal Corporation ("AMC") in Ft. Lauderdale, Florida. Pursuant to this search warrant numerous corporate documents were seized. Moreover, information obtained during the July 13 search led to a subsequent search warrant executed at AMC offices on July 18, 1977. Documents seized from both searches were introduced at trial. The appellant Philip Weinstein filed pretrial motions to suppress evidence obtained through both searches. During evidentiary hearings on these motions the district court ruled, and the government conceded, that the defendant had legal standing to raise the issue of fourth amendment violations. We assume that this is so.
 
 
 24
 After evidentiary hearings, the district court denied the motions to suppress in all respects. The district court later denied a renewed motion to suppress and a consequent motion for judgment of acquittal or a new trial on this ground.
 
 
 25
 Appellant Philip Weinstein's attack on the validity of this evidence is two-fold. He argues, first, that the warrant executed on July 13, 1977 was impermissibly overbroad in light of the probable cause shown in support of that warrant. Alternatively, he argues the July 13, 1977 warrant was insufficiently particular. We will address both claims.
 
 
 26
 a. Overbreadth
 
 
 27
 Attached to the July 13, 1977 warrant and incorporated therein by reference was an Exhibit A listing 28 individuals, companies, and organizations thought by the FBI to be involved in the pharmaceutical fraud scheme. Included in this list of individuals and organizations were Philip Weinstein and his companies, AMI and AMC, Robert Falvo, Wilhelmina Harich Weinstein, Stanley Kowitt, Solomon Richman and his company, GABAR, and the purportedly charitable organizations of Opus Christi America, IMA and Church of God World Missions, Inc. Exhibit A also noted the types of documents which were thought to be material to the investigation: correspondence, invoices, cancelled checks, check stubs, address books, diaries, and other documents typically used in a business organization. Also attached to the warrant was an affidavit by FBI agent Claude Roberts reciting the operative facts upon which a conclusion of probable cause was sought. The affidavit set forth in detail the scope and operation of the pharmaceutical fraud scheme. The affidavit did not, however, make mention of the role of GABAR or Solomon Richman in that scheme.
 
 
 28
 On the basis of these facts the appellant Philip Weinstein argues that, because the affidavit did not mention GABAR or Solomon Richman, the magistrate could not conclude probable cause existed as to these entities. Because Exhibit A to the warrant did authorize the seizure of documents pertaining to Richman and GABAR, however, the warrant is alleged to be overbroad.
 
 
 29
 As noted previously, the FBI entered the AMC premises to peruse documents authorized by the magistrate's warrant. The warrant and Exhibit A appended thereto gave clear indication that correspondence addressed to Solomon Richman or GABAR was within the scope of probable cause shown. We believe seizure of a document so apparently within the scope of the warrant would be made in good faith, hence valid. United States v. Leon, --- U.S. ----, 104 S.Ct. 3405, 3421-23, 82 L.Ed.2d 677 (1984).
 
 
 30
 In the instant case, however, we are presented with an officer exercising the utmost of good faith. Entering the AMC premises on July 13, warrant and affidavit in hand, the agent viewed the GABAR file and concluded that, because the affidavit did not recite facts about Solomon Richman or GABAR (even though the exhibit to the warrant did), the content of the file might be beyond probable cause shown. Appellant Philip Weinstein urges that the good faith exception is inapplicable here because, by refusing to seize the GABAR file during the first search, the agent, an experienced member of the FBI, manifested his awareness that he did not have probable cause as to Richman or GABAR. We reject this argument. By declining to seize the GABAR file during the initial search, the agent showed careful respect for the judicial limitations upon his authority to search. We approve such caution, and refuse to allow what is clearly a good faith attempt to abide the fourth amendment's mandate to become, through judicial interpretation, the indicium of bad faith. Assuming arguendo that the warrant authorizing the initial search of AMC premises was overbroad, we nevertheless hold that documents viewed during the course of that search and seized during the course of a second, need not be excluded. They were obtained in good faith reliance upon the warrant. United States v. Leon, --- U.S. at ----, 104 S.Ct. at 3423 (1984).
 
 
 31
 b. Particularity
 
 
 32
 Appellant Philip Weinstein also argues that the initial search warrant was insufficiently particular and invalid. Consequently the second search warrant obtained as a fruit of the first was also invalid. The warrant in question authorized the FBI to search the premises of American Medicinal Corporation for property identified in Exhibit A, attached to the warrant and expressly incorporated within it. The warrant stated that the property sought was
 
 
 33
 relevant and material to alleged violations of the mail fraud statute (Title 18 U.S.C. Sec. 1341), the wire fraud statute (Title 18 U.S.C. Sec. 1343) and Racketeer Influenced Corrupt [sic] Organizations statute (Title 18, U.S.C. Sections 1961 to 1968 inclusive) committed in the Southern District of Florida and elsewhere....
 
 
 34
 Exhibit A identified the property sought as:
 
 
 35
 [c]orrespondence, invoices, cancelled checks, check stubs, telegrams, bills of lading, warehouse receipts, bank statements, ledgers, work papers, purchase orders, telephone toll records, address books, daily diaries, calendars, customer lists, autodexes, intracorporate and intercorporate memoranda, and credit card statements pertaining to the following individuals, business firms, and/or purported charities: ...
 
 
 36
 Exhibit A then set out twenty-eight individuals, business firms, and purported charities which were suspected of involvement in the pharmaceutical fraud scheme.
 
 
 37
 Clearly, an affidavit incorporated into a warrant by express reference and attached to and accompanying the warrant can cure ambiguity in the warrant itself. United States v. Wuagneux, 683 F.2d 1343, 1351 n. 6 (11th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); United States v. Haydel, 649 F.2d 1152, 1154-58 (5th Cir.), corrected, 664 F.2d 84 (5th Cir.1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982). The affidavit of FBI agent Roberts, attached to the warrant, set out the scope and operation of the pharmaceutical fraud scheme thought to be operated by, inter alia, AMC, AMI and Philip Weinstein. Included within that affidavit were the dates during which the scheme was believed to have operated. Moreover, the agents conducting the challenged searches were briefed about the investigation; the agent who investigated the case was available to answer questions. On the basis of this showing we believe that the warrant, both as issued and as executed, was sufficiently particular in scope to pass muster under the fourth amendment.[4] As the initial warrant was valid, so the second warrant, issued on the basis of probable cause ascertained during the initial search, was likewise valid.
 
 
 38
 2. Stanley Kowitt.
 
 
 39
 As with Philip Weinstein and AMC, the FBI twice searched the offices of Majestic Sales, the business of the appellant Stanley Kowitt. Appellant Kowitt disputes the admission of evidence seized in these searches because the description of the premises contained in the warrants was, he asserts, legally insufficient.[5] Majestic Sales was in the southwest, not the northwest corner of the building as indicated in the warrant. This discrepancy, appellant Kowitt claims, left to the searching officers a degree of discretion not countenanced by the Constitution. We disagree.
 
 
 40
 As we stated in Haydel, "[a] warrant's description of the place to be searched need not meet technical requirements nor have the specificity sought by conveyancers. It need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." 649 F.2d at 1157. See also Steele v. United States No. 1, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925); United States v. Prout, 526 F.2d 380, 386-88 (5th Cir.), cert. denied, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); United States v. Gitcho, 601 F.2d 369, 371-72 (8th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); United States v. Campanile, 516 F.2d 288, 291 (2d Cir.1975). An erroneous description of premises to be searched is not necessarily fatal to the validity of a warrant. United States v. Melancon, 462 F.2d 82, 94 (5th Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972). The fourth amendment requires merely that the search warrant describe the premises in such a way that the searching officer may "with reasonable effort ascertain and identify the place intended." Steele, 267 U.S. at 503, 45 S.Ct. at 416 (1925).
 
 
 41
 The evidence demonstrated that there were two unconnected offices on the west side of the building housing Majestic Sales. One of those offices was occupied by Majestic Sales, the other by an automobile supply firm. Each office had a separate door on the west side of the building. The agent conducting the searches testified that he had been to the premises before and that he had had no doubt which door gave access to Majestic Sales. Furthermore, when the agents arrived at the Majestic Sales office, their knock was unanswered. They inquired to no avail in the automobile supply firm for information about disconnecting the burglar alarm at Majestic Sales. They then called the burglar alarm company to disconnect the alarm and a locksmith to open the door.
 
 
 42
 We hold that under the circumstances presented here the warrants' erroneous designation of the wrong corner of the building did not invalidate the warrants or the searches conducted pursuant to them. Steele, 267 U.S. at 503, 45 S.Ct. at 416; Prout, 526 F.2d at 386-88; United States v. Darensbourg, 520 F.2d 985, 986-88 (5th Cir.1975); Melancon, 462 F.2d at 94.
 
 B. Evidentiary Errors
 
 43
 As a preface to their arguments against sufficiency of the evidence, all appellants raise a number of issues concerning the district court's rulings on the admissibility of evidence. We address these contentions here.
 
 
 44
 1. Erroneous exclusion of defense evidence.
 
 
 45
 A recurring theme in the briefs and arguments of all appellants is that the district court incorrectly excluded evidence concerning the nature of the appellant's activities in the context of the pharmaceutical market. Through one fashion or another, this evidence was calculated to show that the antitrust laws of the United States relieved the appellants of criminal responsibility and that evidence of the operation of these laws was material to the defense. Two arguments are made.
 
 
 46
 Appellants first argue that the pricing scheme avoided by their misrepresentations was itself illegal under antitrust law. Avoidance of an illegal scheme is not a crime, they urge, and thus, because they did not believe their misrepresentations to have been criminal, scienter was absent and a finding of fraud precluded. We find this argument untenable. The merits of manufacturers' claims of right to sell drugs domestically at uniform prices is immaterial to the issue of fraud. If defendants doubted the legality of that practice their recourse would have been through antitrust action, not through a scheme of misrepresentations communicated through U.S. mails and wires.
 
 
 47
 Secondly, appellants argue that their misrepresentations were not material because the manufacturers were aware appellants did not really represent charitable or export interests. Without materiality, they point out, there could be no fraud. This argument, too, cannot stand. The district court, while he excluded evidence on the antitrust laws, allowed considerable evidence on the operation and the legitimacy of the American diversion industry, including defendants' allegation that some manufacturers "wink" at representations of nonprofit or export status in order to use the diversion market as a "dumping-ground" for drugs nearing expiration. Thus the issue of materiality was framed for the jury, and in finding fraud they determined that issue.
 
 2. Authentication of Documentary Exhibits
 
 48
 a. Telexes in support of wire fraud counts.
 
 
 49
 Philip Weinstein and Wilhelmina Harich Weinstein argue that a purported telex in support of Count V (wire fraud) was improperly admitted because there was no evidence that the telex was actually transmitted.
 
 
 50
 Identification and admissibility of evidence is within the discretion of the trial court. Bury v. Marietta Dodge, 692 F.2d 1335, 1338 (11th Cir.1982); Meadows and Walker Drilling Co. v. Phillips Petroleum Co., 417 F.2d 378, 382 (5th Cir.1969). Moreover, letters and presumably telegrams are prima facie authentic if their content is responsive to prior properly admitted communications. 3 Wharton's Criminal Evidence Sec. 525 (1973); 5 J. Weinstein and Burger, Weinstein's Evidence paragraphs 901(b)(4) and (1983).
 
 
 51
 The telexes in question were responsive to a June 9, 1977 letter from Solomon Richman to Philip Weinstein. The admission of the June 9 letter is not disputed. The evidence is therefore sufficient to support a finding that the telex in question is what the government claims it to be. Fed.R.Evid. 901(a). Additionally, we hold that the content of the telexes evidence use of interstate communications facilities. See United States v. Goss, 650 F.2d 1336, 1343 (5th Cir. Unit A 1981).
 
 
 52
 b. The GABAR envelope.
 
 
 53
 More problematical is the appellant Wilhelmina Weinstein's argument that the government failed to authenticate an envelope attached to the government's Exhibit 230. Government's Exhibit 230 is a copy of a letter dated June 9, 1977 from Richman and GABAR in Belgium addressed to the AMC offices of Philip Weinstein in Ft. Lauderdale, Florida. The June 9th letter summarized the sales and purchases between GABAR and AMC from November, 1976, to February, 1977. The letter also voiced concern about the appearance of pharmaceutical products diverted through AMC on the pharmaceutical diversion market and the pharmaceutical manufacturers' awareness of these appearances. The letter also set out proposed conditions for continued business between GABAR and AMC. The June 9 letter was seized by the FBI at the AMC offices pursuant to the second warrant executed on July 18, 1977. The letter was identified at trial by the FBI officer in charge of the investigation. Counsel for Wilhelmina Weinstein objected to the connection of the letter and envelope at the close of the government's case. The court reserved ruling on the envelope's admissibility until further evidence was received.
 
 
 54
 The June 9th letter was addressed to Philip Weinstein. Attached to the letter at trial was an envelope, postmarked June 21, 1977, Brussels, addressed to Wilhelmina Weinstein at her residence. The envelope was evidently seized at the same time and place as the letter. Wilhelmina Weinstein does not contest the content of the letter, but argues that the envelope which connects her to that content was not part of the original exhibit, and was improperly admitted because it was not independently authenticated. At the close of all evidence in the case she moved for judgment of acquittal or new trial on this ground, pointing out that there was no testimony whatsoever as to the envelope. The government responded that the envelope was at all times attached to the letter and that, as early as the grand jury investigation, the document was described as "a letter addressed to Ms. Wilma Harich postmarked June 21, 1977, at Brussels, Belgium." Moreover, the government now argues that certain remarks of appellants' counsel at a pretrial hearing indicate their awareness that an envelope was attached to the letter. The district court permitted the envelope to remain stapled to the government's exhibit and denied without opinion the defendant's motion for judgment of acquittal or new trial on this issue.[6]
 
 
 55
 In our careful review of this record we have been unable to find (and counsel for the government has been unable to point out) any evidence linking the envelope addressed to Wilhelmina Harich Weinstein to the letter addressed to Philip Weinstein. Indeed the only connection between these two documents which the evidence in this case supports is the fact that the letter and the envelope were stapled together at the time of their production before the grand jury. If this letter were sent in the envelope at issue, the defense of the appellant Wilhelmina Harich Weinstein would have been substantially impaired. One claiming to be a non-participating bystander would be hard put to explain the receipt of such a conspiratorial writing. The acceptance of the letter and the envelope into evidence as one exhibit, stapled together, with no testimony or other evidence linking the two documents, was error and prejudicial to Wilhelmina Weinstein's defense. The harm accruing from this error being unquestionable, the conviction of appellant Wilhelmina Weinstein must be vacated and the case against her remanded for a new trial.
 
 
 56
 3. Admissibility of Coconspirator Hearsay.
 
 
 57
 The appellant Solomon Richman argues that hearsay statements, by alleged coconspirators, admitted against him at trial were inadmissible under Fed.R.Evid. 801(d)(2)(E) because they were not statements made during the course and in furtherance of a conspiracy. Appellant Richman argues there was insubstantial independent evidence to support the admission of the hearsay statements of the appellant's alleged coconspirators. United States v. Alvarez, 696 F.2d 1307, 1310 (11th Cir.), cert. denied, 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983); United States v. James, 590 F.2d 575, 578-81 (5th Cir.), (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).
 
 
 58
 In James our predecessor court held that a trial judge must determine admissibility of coconspirator hearsay based upon substantial and independent evidence (a) that a conspiracy existed, (b) that the defendant and the declarant both were members of the conspiracy, and (c) that the hearsay statements sought to be admitted were made in furtherance of the conspiracy. James, 590 F.2d 578-81. Moreover, even if the requirements of James are not met and coconspirator hearsay is improperly admitted, that admission may nevertheless be harmless error. United States v. Phillips, 664 F.2d 971, 1026-27 (5th Cir. Unit B 1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
 
 
 59
 The hearsay testimony of which the appellant Richman principally complains came in through testimony by Boudewijn Van Pamelen[7] about statements made to him by Wilhelmina Weinstein. This testimony was generally to the effect that Van Pamelen met (then) Wilhelmina Harich in Germany in 1974 and that she accompanied him to the United States. Van Pamelen testified that during the time Wilhelmina Harich Weinstein cohabited with him she told him that pharmaceutical products were transferred from the Church of God to third parties and eventually to the GABAR corporation for resale in the United States.
 
 
 60
 The government urges that there was sufficient proof of a conspiracy under James to establish the admissibility of these coconspirator hearsay statements. Alternatively, the government argues that any error in admitting the alleged hearsay was harmless because testimony so allowed was cumulative. See e.g., United States v. Means, 695 F.2d 811 (5th Cir.1983).
 
 
 61
 The June 9th letter from Richman to Philip Weinstein links Richman to Weinstein, hence to the conspiracy and Wilhelmina Weinstein, the declarant of Van Pamelen's testimony. However, we note that the statements of which the appellant Richman principally complains are not, on their face, in furtherance of the conspiracy. As such, the central requirement of James would appear to be unsatisfied in the instant case.
 
 
 62
 We need not decide that question, however, because the statements at issue are, in our view, cumulative. At least in a nonconstitutional sense, therefore, see e.g., Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946), any error from their admission must be deemed harmless. Means, 695 F.2d at 818; Phillips, 664 F.2d at 1027, n. 84. Additionally, although appellant Richman does not expressly raise the point, we note that it is still an open question in this circuit whether erroneous admission of coconspirator hearsay may constitute a violation of the constitutional right to confrontation of witnesses.[8] We need not now decide that issue because the evidence presented in the admissible June 9, 1977 letter from Richman to Philip Weinstein was overwhelmingly probative of guilt.[9] It is our view that the cumulative admission of potentially erroneous hearsay statements linking Solomon Richman to the conspiracy at issue were, beyond a reasonable doubt, not determinative of the outcome of this trial as to the appellant Richman. Accordingly, any constitutional error in the admission of these statements was harmless in a constitutional sense as well. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
 
 IV. THE SUFFICIENCY OF THE EVIDENCE
 
 63
 We come then to the heart of this case, the sufficiency of the evidence as to RICO conspiracy and underlying overt acts as to each appellant. In order to make this evaluation we must examine, first, the elements of the charged offenses, RICO conspiracy and the essential predicate acts thereto.
 
 
 64
 Count One of the superseding indictment charged all appellants with conspiracy to violate the RICO statute. Fifty-seven overt acts were alleged to have been committed in furtherance of that conspiracy.[10] Count II charged Philip Weinstein with wire fraud. Count III charged Philip Weinstein and Wilhelmina Harich Weinstein with mail fraud. Count IV charged Solomon Richman and Philip Weinstein with wire fraud. Count V charged Solomon Richman, Philip Weinstein and Wilhelmina Harich Weinstein with wire fraud. Counts VI and VII charged Solomon Richman and Philip Weinstein with wire fraud. Counts VIII through XIII of the indictment charged income tax evasion against various appellants herein.[11]
 
 
 65
 Proof of a RICO conspiracy charge puts upon the government the burden to show beyond a reasonable doubt that each appellant herein objectively manifested an agreement to participate, directly or indirectly, in acts violating the substantive provisions of RICO. A substantive violation of RICO requires proof of the following elements:
 
 
 66
 (1) The existence of an enterprise which affects interstate or foreign commerce, (2) that the defendant 'associated with' the enterprise; (3) that the defendant participated in the conduct of the enterprises' affairs; and (4) that the participation was through a pattern of racketeering activity, [that is that the defendant committed] at least two acts of racketeering activity designated in 18 U.S.C. Sec. 1961(1).
 
 
 67
 Phillips, 664 F.2d at 1011.
 
 
 68
 Breaking this definition into its component parts, we examine first the meaning of a RICO enterprise within the meaning of the statute.[12] In United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court held that the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id. at 583, 101 S.Ct. at 2528. Turkette left intact this circuit's holding in United States v. Elliott, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). United States v. Cagnina, 697 F.2d 915, 921 (11th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983) ("Turkette does not prevent this court from adhering to Elliot [Elliott]."). Elliott made it clear that the definitive factor in determining the existence of a RICO enterprise was an association of individuals, however loose or informal, which furnishes a vehicle for the commission of two or more predicate crimes (the pattern of racketeering activity requisite to the RICO violation). Elliott, 571 F.2d at 898. In United States v. Hewes, 729 F.2d 1302 (11th Cir.1984), we held "that a RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." Hewes, 729 F.2d at 1311.[13]
 
 
 69
 A pattern of racketeering activity is defined in the statute as
 
 
 70
 [A]t least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.
 
 
 71
 18 U.S.C. Sec. 1961(5). Racketeering activity is in turn identified in 18 U.S.C. Sec. 1961(1) as being various acts, the commission of which constitute violations of federal or state law. Proof of RICO conspiracy requires proof of an agreement to violate a substantive RICO provision. United States v. Carter, 721 F.2d 1514, 1528 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984).
 
 
 72
 With these principles in mind we review the evidence in this case to determine whether the requisite showing of conspiracy to violate a substantive RICO provision was made. In doing so we inquire whether, viewed most favorably to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); Hewes, 729 F.2d at 1320 (11th Cir.1984), the evidence would permit a reasonable trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We review the evidence as to each appellant.
 
 A. Wilhelmina Weinstein
 
 73
 The appellant Wilhelmina Weinstein argues that the evidence demonstrated merely that she was a secretary for the operations of AMI, AMC and Philip Weinstein, that she made no decisions of policy, and that she at no time agreed to conspire to violate RICO. We have carefully reviewed the evidence of Wilhelmina Weinstein's participation in the conspiracy and conclude that it was sufficient to make out a question of fact on that issue. However, we have held the envelope portion of government's Exhibit 230, the GABAR letter of June 9, 1977, to have been improperly admitted into evidence and to have been prejudicial. Because we vacate Wilhelmina Weinstein's conviction on this ground, we decline to review further her claims as to sufficiency of the evidence.
 
 B. Stanley Kowitt
 
 74
 In order to make out its case against appellant Kowitt, the government bears the burden of proving beyond a reasonable doubt that he knew, actually or constructively, that the pharmaceutical products he obtained were acquired through misrepresentations to the manufacturers. In reviewing the sufficiency of the evidence as to this showing we must take care, under the peculiar facts of this case, to ascertain whether the jury was allowed to draw improper inferences of fraud from the peculiar and necessarily clandestine practices of the diversion industry. Diversion itself is not contended to be illegal. Evidence that Kowitt removed labels from the pharmaceuticals he obtained from his suppliers proves no crime. Evidence that Kowitt requested certain pharmaceutical products for which he had a ready market and from which he could make a quick profit, evidence that Kowitt demanded goods packaged in English, evidence that Kowitt tendered payment upon delivery for pharmaceutical goods--none of these facts are probative of guilt. At most, this evidence serves as a basis only for the inference that Stanley Kowitt was an exacting customer of an entity which he may or may not have known to be committing fraud.
 
 
 75
 Upon an exhaustive review of this 4,000 plus page record, we conclude that the essential evidence supporting the jury's finding that Stanley Kowitt participated knowingly in a scheme involving fraudulent misrepresentation was the conversation testified to by Peter Fixler which took place between Fixler and Kowitt. In this conversation Stanley Kowitt told Peter Fixler "make sure whoever was buying the pharmaceuticals that they tell the pharmaceutical company that ... birth control pills were not going to countries that did not allow them, so maybe Spain or the Roman Catholic countries. That would make the pharmaceutical companies wise." The question for our determination is thus whether this evidence is enough. We hold that it is.
 
 
 76
 While we have evaluated the evidence in this case as required by Glasser, supra, we have nevertheless scrutinized the evidence pointing to Kowitt's participation in RICO and underlying counts with particular care lest evidence of disapproved business practices be confused with evidence of the crimes charged. Kowitt and his codefendants were not charged with conducting business in a fashion disapproved by pharmaceutical manufacturers. They were charged with violating RICO through mail and wire fraud, federal crimes. Neither federal attorneys nor courts may be used to assist business houses in policing their requirements for product distribution. However, the fact that Kowitt and his coappellants were admittedly distributing the obtained products through diversion contrary to the wishes of the pharmaceutical manufacturers provided a sufficient and strong motive for the commission of fraud. It is the duty of the court to make certain defendants were not convicted merely because they did that which was disapproved, while yet admitting evidence of disapproval as a motive for the fraud alleged. Our critical review of the evidence in this case and of the trial judge's instruction to the jury has satisfied us that the district court was aware of this potential confusion. We believe that his instructions properly directed the jury's attention to the requirement of law that the government prove mail and wire fraud above and beyond participation in disapproved marketing practices.
 
 
 77
 There was abundant proof that fraudulent misrepresentations to pharmaceutical manufacturers furthered Kowitt's interests. Evidence therefore established Kowitt's motive for fraud. Moreover, Fixler's testimony established that Kowitt counselled his suppliers as to the content of their fraudulent misrepresentations. This evidence proved Kowitt's participation in fraud. We hold the evidence against Kowitt sufficient to sustain his conviction.
 
 
 78
 C. Appellants Philip Weinstein, Solomon Richman, and Robert
 
 Falvo
 
 79
 Our review of the record in this case reveals ample evidence upon which a rational trier of fact could conclude that the appellants Philip Weinstein, Solomon Richman, and Robert Falvo agreed to participate and participated in a conspiracy in violation of RICO. Sufficient evidence therefore exists as to each of these.V. ERRORS IN THE INDICTMENT
 
 A. Material Amendments to the Indictment
 
 80
 1. Count II.
 
 
 81
 Count II of the indictment charged mail fraud. Of the appellants in this case, only Philip Weinstein was named in that count. However, the trial court charged the jury on Count II not only against Philip Weinstein, but also against Robert Falvo, Stanley Kowitt, Solomon Richman, and Wilhelmina Weinstein. We vacate the judgments of conviction on Count II as to the appellants Wilhelmina Weinstein, Robert Falvo, Stanley Kowitt and Solomon Richman.
 
 
 82
 2. Fifth amendment violation.
 
 
 83
 The appellant Wilhelmina Weinstein argues that the jury's improper consideration of her guilt as to the Count II mail fraud charge resulted in a misconstruction of the indictment, effecting a material amendment to the indictment requiring reversal of her conviction on all remaining counts in this case. She relies upon Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), as authority for this result.[14] In light of our disposition of Wilhelmina Weinstein's conviction, we are not required to reach this issue. In the interest of clarity on remand, however, we address it briefly.
 
 
 84
 It is well established that "the erroneous amendment of one count does not destroy other counts of the indictment nor invalidate the judgment of conviction thereon ... in the absence of a showing of prejudice." C. Wright, Federal Practice and Procedure: Crim.2d Sec. 127 n. 16 and accompanying text (citing Chow Bing Kew v. United States, 248 F.2d 466 (9th Cir.), cert. denied, 355 U.S. 889, 78 S.Ct. 259, 2 L.Ed.2d 188 (1957); Carney v. United States, 163 F.2d 784 (9th Cir.), cert. denied, 332 U.S. 824, 68 S.Ct. 165, 92 L.Ed. 400 (1947)). Thus, while it is clear that the conviction of appellant Wilhelmina Weinstein on the improperly amended Count II must be vacated, see e.g. United States v. Fischetti, 450 F.2d 34 (5th Cir.1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1972); C. Wright, supra, section 127 n. 1 (and accompanying text), there is no basis in law for the proposition that this improper amendment on Count II affected the validity of the remaining convictions under other counts of the indictment.[15]VI. MISJOINDER AND SEVERANCE
 
 A. Philip Weinstein
 
 85
 The appellant Philip Weinstein argues that failure to grant a severance of his prosecution from the trial of his codefendants violated his sixth amendment right to cross-examine a substantial government witness as to credibility and veracity on the required elements of the charged offense. He urges reversal on this ground, relying on United States v. Lindstrom, 698 F.2d 1154, 1163-64 (11th Cir.1983); and United States v. Callahan, 551 F.2d 733, 737 (1977), aff'd after remand, 579 F.2d 398 (6th Cir.1978).
 
 
 86
 The witness appellant Weinstein wanted to cross-examine was David Pollard. Early in the trial the court excluded testimony adduced by the government from Pollard that Robert Falvo and Frank Dante, an associate of Robert Falvo, were attempting to extort a share of the profits derived from the pharmaceutical diversion enterprise from the other participants in that scheme. The gravamen of Philip Weinstein's contention is that he should have been allowed to cross-examine Pollard (a) to impeach his testimony, and (b) to dispel any impression that Weinstein voluntarily aided extortion attempts. He argues that, by denying his motion to sever or for a mistrial on this issue made during the cross-examination of Pollard, the district court denied him the opportunity to cross-examine Pollard on these points and thus worked a deprivation of sixth amendment right.
 
 
 87
 The government answers Philip Weinstein's claim on this issue by noting that his proffered ground for severance at trial was that he sought further examination of Pollard to show that Pollard was himself part of the alleged extortion attempt instigated by Frank Dante and Robert Falvo. This testimony would have gone to Pollard's credibility. Robert Falvo's attorney pointed out to the trial court that the court's prohibition of evidence on extortion prevented this line of inquiry. Under these circumstances the district court observed that it could perceive no obvious prejudice to Weinstein from the limitation of cross-examination on Pollard's testimony as to extortion. Philip Weinstein's trial counsel specifically denied that it was the defense theory Weinstein was a victim of Falvo. Thus, the government urges that the district court's limitation of testimony as to extortion was a reasonable measure against prejudice. That limitation did not bar Weinstein from putting on his defense, but simply disallowed him from showing to the jury that Pollard was himself a part of the scheme he (Pollard) depicted and thus a less credible witness.
 
 
 88
 To overturn a district court's denial of severance under Fed.R.Crim.P. 14, the defendant must demonstrate clear and compelling prejudice. United States v. Sans, 731 F.2d 1521, 1533 (11th Cir.1984); Hewes, 729 F.2d at 1319; United States v. Cannington, 729 F.2d 702, 710 (11th Cir.1984). We hold that no such clear and compelling prejudice has been shown.[16]
 
 B. Solomon Richman
 
 89
 The appellant Solomon Richman argues he was misjoined in violation of Fed.R.Crim.P. 8(b) and that the trial court's denial of his motion to sever was prejudicial and is a ground for reversal of his conviction.
 
 
 90
 Rule 8(b) provides for the joinder of two or more defendants in the same indictment if it is alleged that they participated in the same criminal transaction upon which the prosecution is brought. It is Richman's position that, because it is not alleged he participated in the activities of Opus Christi or the Church of God, the indictment failed to show the substantial identity of facts or participants necessary for proper joinder under Rule 8(b). Richman relies upon United States v. Sutherland, 656 F.2d 1181 (5th Cir.1981), cert. denied, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); and United States v. Bledsoe, 674 F.2d 647 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The government argues that, taken as a whole, the indictment charged the appellants with a single enterprise operated for the purpose of obtaining pharmaceutical products through false pretenses. The common thread linking Richman to this attempt was his alleged participation in the scheme to obtain preferential pharmaceutical prices by fraud. These allegations are mirrored in the RICO conspiracy indictments. The government relies upon United States v. Hewes, 729 F.2d 1302 (11th Cir.1984), and United States v. Phillips, 688 F.2d 52 (8th Cir.1982).[17]
 
 
 91
 As we view this issue, it merely restates the appellant Richman's underlying and repeated contention that there existed no evidence linking him to a conspiracy to defraud pharmaceutical manufacturers. Because we hold the evidence sufficient to sustain a conspiracy indictment and conviction against appellant Richman, there is necessarily a "sufficient common link" to demonstrate the existence of a common scheme or plan. As such, Rule 8(b) is satisfied. See United States v. Kopituk, 690 F.2d 1289, 1313-14 (11th Cir.1982), cert. denied, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983).
 
 VII. PROSECUTORIAL MISCONDUCT
 A. Improper Remarks by the Prosecutor
 
 92
 The appellants Wilhelmina and Philip Weinstein and appellant Robert Falvo argue that remarks made by the prosecutor and government witnesses were improper and prejudicial and should have resulted in a dismissal of the indictment or, alternatively, a mistrial.
 
 
 93
 The appellant Falvo contends that the prosecutor deliberately and repeatedly attempted to interject evidence of extortion into the trial proceedings. The district court, although it warned the prosecutor against this conduct, denied a motion for mistrial on this ground. Four instances of alleged prosecutorial misconduct are urged. In opening, the prosecutor referred to one of the characters in the alleged conspiracy as a "strong man." The trial judge cautioned the prosecutor against such characterizations. The court also offered to give an instruction to the jury but none was sought. The government argues, that at the time these statements were made, the district court had not yet determined to exclude all evidence of extortion. As such, the government argues it should not be charged with knowing that the phrase "strong man" was an improper characterization.
 
 
 94
 As a second ground of alleged error, the prosecutor included in his closing argument reference to appellant Falvo as being the person "pulling the strings." This comment was the subject of the trial judge's reprimand before the jury to the prosecutor for making an argument from material stricken from the jury's consideration. The judge instructed the jury "to disregard any evidence or any comment on testimony about Mr. Falvo pulling strings."
 
 
 95
 A third ground of error is urged as testimony from one of the government's witnesses that Frank Dante "looked like a person out of the Untouchables, like [a] Frank Nitty-type character." Here, also, the district court instructed the jury to "disregard the last answer. Stereotypes are not evidence, and you are to disregard them entirely."
 
 
 96
 Finally, another government witness testified that, in a meeting about their business relationships, Robert Falvo used foul language and made strong statements about the witness's wife. There was no curative instruction on this testimony. A motion for mistrial, apparently on the basis of this testimony was denied.
 
 
 97
 The appellants Philip and Wilhelmina Weinstein revisit these same instances of alleged improper remarks by the prosecutor. In essence they urge the district court's determination that the inferences of Mafia activities and extortion which arose from the impermissible testimony were so damaging that the trial court abused discretion in refusing to grant a mistrial.
 
 
 98
 Reversal on the basis of prosecutorial misconduct requires that the misconduct be "so pronounced and persistent that it permeates the entire atmosphere of the trial." United States v. Alanis, 611 F.2d 123, 126 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980), (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)). See also United States v. Newbern, 731 F.2d 744, 754 (11th Cir.1984). Moreover, a prejudicial remark may be rendered harmless by curative instructions to the jury. United States v. Nickerson, 669 F.2d 1016, 1020 (5th Cir. Unit B 1982); United States v. Lichenstein, 610 F.2d 1272, 1282 (5th Cir.), cert. denied, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). Finally, considerable weight must be given to the trial court's assessment of the prejudicial effect of the remarks in question. Nickerson, 669 F.2d at 1020; Blevins, 555 F.2d at 1240.
 
 
 99
 While we emphatically disapprove the remarks made by the prosecutor in this case, we believe that the trial court provided an opportunity to cure any potential prejudice in three of the four instances to which appellants allude. The fourth instance was, in our view, harmless. We are also mindful that we evaluate these allegedly improper remarks in the context of a four week trial; we believe the trial judge, whose vantage was superior to ours, to have correctly concluded the allegedly improper remarks were not so pronounced and persistent as to permeate the entire atmosphere of the trial. We therefore hold the trial judge correctly denied motions for mistrial on the basis of improper prosecutorial remarks.
 
 B. Unconscionable Delay in Prosecution
 
 100
 Robert Falvo argues the district court erred in denying his motion to dismiss the indictment on the basis of an unconscionable delay in prosecution. He alleges prejudice to his defense accruing from the death of an associate of Falvo's, Frank Dante, between 1979 and the date of prosecution. A government prosecutor testified at a pretrial hearing in his case that the government was ready to indict Falvo as early as 1979. The five-year statute of limitations, 18 U.S.C. Sec. 3282 (1982), had not expired at the time this prosecution was commenced.
 
 
 101
 Statutes of limitations provide the primary guarantee against stale criminal charges. United States v. Lovasco, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); United States v. Marion, 404 U.S. 307, 317-19, 92 S.Ct. 455, 462-63, 30 L.Ed.2d 468 (1971); United States v. Hendricks, 661 F.2d 38, 38-39 (5th Cir.1981). Additionally, to succeed on a motion for dismissal of an indictment based upon unconscionable delay a defendant must demonstrate both a substantial prejudice to his right of a fair trial and an intentional delay on the part of the government made in order to gain tactical advantage over the accused. Tiemens v. United States, 724 F.2d 928, 929 (11th Cir.1984). As we have observed, "this standard is an exceedingly high one...." Id. We hold that Falvo has demonstrated neither that the government delayed for tactical advantage, nor that he sustained sufficient prejudice to overcome the high standard upon which we review his claims. Accordingly, the judgment of the district court as to prosecutorial misconduct by unconscionable delay is affirmed.
 
 VIII. SUMMARY
 
 102
 In summary, in case number 83-5260 we hold that the convictions of Wilhelmina Weinstein, Solomon Richman, and Robert Falvo, are VACATED as to Count II of the indictment charging wire fraud. The conviction of Wilhelmina Weinstein is VACATED as to all remaining counts. In all other respects the judgment in 83-5260 is AFFIRMED.
 
 
 103
 In case number 83-5570 the conviction of Stanley Kowitt is VACATED as to Count II of the indictment charging wire fraud. In all other respects the judgment in 83-5570 is AFFIRMED.
 
 
 
 *
 Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Wilhelmina Harich Weinstein is the wife of Philip Weinstein. Because the counts with which this action is concerned commenced prior to that marriage, during part of the time at issue here she was known as Wilhelmina or Wilma Harich. Unless otherwise noted in text, she will be referred to herein as Wilhelmina Weinstein or Wilhelmina Harich Weinstein
 
 
 [2]
 The specific claims raised by each appellant are as follows:
 Philip Weinstein raises six grounds of error: (1) that the trial court erroneously denied his motion to suppress evidence on fourth amendment grounds; (2) that the district court erroneously denied his motion for judgment of acquittal on the wire fraud counts of the indictment because of errors in presentation of evidence in support of those counts; (3) that the government improperly prosecuted the appellant for activities not within the scope of the RICO statute; (4) that the district court erroneously denied a motion for mistrial on the basis of prejudicial evidence ruled inadmissible but put before the jury; (5) that the district court erroneously denied the defendant's motion for severance; and (6) that the government's proof was insufficient on the issue of RICO enterprise.
 Wilhelmina Weinstein raises five grounds of error: (1) that the district court erroneously admitted into evidence an improperly authenticated envelope attached to a properly authenticated letter; (2) that the district court's denial of the defendant's motion for judgment of acquittal on Count II, wherein the defendant was not named, effected a material amendment to the indictment; (3) that the court erroneously denied defendant's motion for judgment of acquittal on Count III, alleging wire fraud, because of factual variance between indictment and proof; (4) that there was insufficient evidence of interstate transmission to support a wire fraud charge; and (5) that the government failed to make out a RICO conspiracy; (6) (adopting by reference the argument of appellant Philip Weinstein) that the district court erroneously denied a mistrial on the basis of prejudicial evidence put to the jury but ruled inadmissible; and (7) (adopting by reference the argument made by the appellant Solomon Richman) that the antitrust laws of the United States preclude the imposition of criminal liability for the acts proved at trial.
 Solomon Richman raises five points of error: (1) that the antitrust laws of the United States preclude the imposition of criminal liability for the conduct proved at trial; (2) that the evidence was insufficient to establish guilt; (3) that Solomon Richman was misjoined in violation of Federal Rules of Criminal Procedure Rule 8(b); (4) that the government failed to prove materiality in support of its prosecution for fraud; and (5) that the trial court erroneously admitted coconspirator hearsay.
 Robert Falvo raises six points of error: (1) that the indictment failed to charge a criminal offense; (2) that the trial court erroneously failed to instruct the jury on principles of antitrust law necessary to the jury's understanding of the issues in this case; (3) that the jury's general verdict was invalid because potentially based on alternate theories, at least one of which was legally insufficient to support a conviction; (4) that there was insufficient evidence to link the appellant Falvo with fraudulent activities alleged on the part of the other defendants; (5) that the appellant Falvo's prosecution was barred by unconscionable delay in prosecution; and (6) that the trial of the appellant Falvo was tainted by prosecutorial misconduct.
 Stanley Kowitt raises five points of error: (1) that the evidence was insufficient to sustain a conviction; (2) that the court erred in its evidentiary rulings and in the charge to the jury because of a misunderstanding of the antitrust laws of the United States; (3) that the trial court erroneously granted a deliberate ignorance instruction; (4) that the trial court erroneously denied appellant Kowitt's motion to suppress evidence obtained through improper search warrants; and (5) that the court erroneously denied a motion to dismiss the indictment on the basis of an unconscionable delay in prosecution.
 Appellees also adopt by reference various arguments raised by co-appellants.
 
 
 [3]
 See footnote 2 supra at (Manuscript) 3-4
 
 
 [4]
 By so holding we express our belief that the warrants at issue adequately guided the searches conducted by the FBI. In order to make that determination we must necessarily and properly consider the nature of the case under investigation. Wuagneaux, 683 F.2d at 1349
 Accordingly, in cases such as the one before us involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the "paper puzzle."
 Id. In the final analysis this requirement of flexibility requires us to strike a balance between the "practical necessities of law enforcement" and "the likelihood of a violation of the personal rights of the one whose premises and possessions are to be searched." United States v. Cook, 657 F.2d 730, 733 (5th Cir. Unit A 1981) quoted in Wuagneaux, 683 F.2d at 1349. Under the circumstances presented we conclude that, given the complexity of the fraud scheme investigated here, the warrant and its exhibits and affidavit comprised an authorization for a search as particular as might be under the circumstances.
 
 
 [5]
 Warrants for both searches described the premises as follows:
 Majestic Sales Corp., 2501 S. 56th Avenue, West Hollywood, Florida, more particularly described as a single story white stucco warehouse building having an entrance facing the west side of the said building on the northwest corner of the said building.
 
 
 [6]
 The basis of the district court's decision to allow the two documents to remain stapled together appears to have been the mistaken belief that the June 21, 1977 postmark reflected the date of the letter's receipt in Florida. The government concedes that this was erroneous. The June 21, 1977 postmark reflected the date the letter was processed in Brussels, Belgium, not the date of its receipt in Ft. Lauderdale
 
 
 [7]
 Boudewijn Van Pamelen met (then) Wilhelmina Harich in Berlin, West Germany in 1974. Van Pamelen later asked Ms. Harich to join him in Miami, Florida and at some point during the relationship persuaded Ms. Harich to marry him. Because Van Pamelen was already married at that time, Ms. Harich later had this marriage annulled
 
 
 [8]
 As the court in Phillips explained, the admission of inadmissible hearsay does not automatically assume constitutional proportions although it arguably violates the confrontation clause. The Phillips court found the error of admission in that case harmless under both the constitutional and nonconstitutional standards; it therefore did not address the question of whether, or under what circumstances, admission of coconspirator hearsay violates the confrontation clause. 664 F.2d at 1027 n. 84
 
 
 [9]
 Most damning is Richman's "condition" put to Philip Weinstein in the body of the letter:
 The new conditions that I speak about are as follows, and you may accept or refuse:
 * * *
 
 
 [2]
 When the material arrives you will be responsible for checking, for any markings, secret markings, invisible markings or anything that would give our operation away to the manufacturer
 
 
 [10]
 The overt acts alleged in support of Count I of the indictment included, generally, the establishment of the various branches of charitable organizations through which pharmaceutical products could be diverted, meetings and agreements reached in those meetings, including contracts for the division of profit, between John Berkey, Philip Weinstein, Robert Falvo, and others, all pertaining to the diversion of pharmaceutical products obtained through Opus Christi and the other charitable organizations, and, wire transfers between John Berkey, Philip Weinstein, Solomon Richman, and others
 
 
 [11]
 These counts were severed by order of the trial court
 
 
 [12]
 Enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4)
 
 
 [13]
 The appellants in Hewes argued that the Eighth Circuit's holding in United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), (a RICO enterprise must possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity) stated a correct definition of RICO enterprise under federal law. Our cases have repeatedly rejected this contention and we reiterate that rejection here. Moreover, in Hewes we also rejected the contention that Turkette 's reference to the RICO enterprise as a "continuing unit" required participation of all members throughout the life of the enterprise. This, too, is not the law of this circuit. Hewes, 729 F.2d at 1311
 
 
 [14]
 In Stirone, the defendant was indicted by a grand jury on charges of unlawful interference with interstate commerce in violation of the Hobbs Act. The specific actions on which the grand jury based this indictment were the defendant's interference with the movement of sand into Pennsylvania. The sand was to be used in the preparation of ready-mixed concrete, which concrete was in turn to be used for the erection of a steel processing plant in Allenport, Pennsylvania. The essential elements of the Hobbs Act crime were extortion and interference with commerce
 The district court allowed evidence not only on the interference with the movement of sand in Pennsylvania, but also on the effect on commerce in steel from the as yet unconstructed steel mill because the construction of that mill required the movement of sand into Pennsylvania. The trial court instructed the jury that
 Stirone's guilt could be rested either on a finding that (a) sand used to make the concrete 'had been shipped from another state into Pennsylvania' or (b) 'Mr. Rider's concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce ...' from Pennsylvania into other states.
 361 U.S. at 214, 80 S.Ct. at 272.
 The Supreme Court reviewing, this charge, held that "it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned." 361 U.S. at 217, 80 S.Ct. at 273. By adding an additional basis for conviction the trial court effectively amended the indictment. In so doing the court "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Id. This deprivation of right was, in the Court's view, more than a variance the effect of which was harmless error; the error was thus fatal and the conviction reversed. 361 U.S. at 219, 80 S.Ct. at 274.
 
 
 [15]
 Stirone, supra, is distinguished by the clear prejudice accruing to the defendant therein. The actions of the trial judge in that case worked to expand the scope of facts upon which the government could rely for conviction. Such is not the case here
 
 
 [16]
 The cases cited by the appellant Philip Weinstein are distinguishable. United States v. Lindstrom, 698 F.2d 1154, 1163-64 (11th Cir.1983), involved the court's limitation on cross-examination of a key government witness. Although that case involved a deprivation of impeachment testimony, the witness whose testimony the defendant sought to impeach was central to the prosecution's case. David Pollard, while his testimony was certainly of use to the prosecution, was neither a central nor the only witness to Philip Weinstein's involvement in the pharmaceutical diversion scheme. United States v. Callahan, 551 F.2d 733, 737 (6th Cir.1977), aff'd, after remand, 579 F.2d 398 (6th Cir.1978), involved an attempt by defendant charged with extortion, to show that the payment of money by the allegedly extorted company was part of the company's regular practice of paying off unions. The denial of cross-examination through a denial of severance in that case was therefore obviously prejudicial
 
 
 [17]
 The government argues that Sutherland and Bledsoe are distinguishable. Those cases involve RICO conspiracies where the indictment was held to effect misjoinder. However, in both cases the prosecutor conceded that the prosecution involved either multiple conspiracies or unrelated fraudulent schemes. No such concession was made by the government in this case