UNITED STATES of America, Plaintiff,

v.

William C. MUSSON, Gary E. Mintz, and William F. Van Nuys, Defendants.

Criminal Case No. 85–CR–304.

United States District Court, D. Colorado.

December 11, 1986.

MEMORANDUM OPINION
AND ORDER

MATSCH, District Judge.

The investigation which led to this prosecution had its origin in the arrest of Fred Beahm and Thomas O'Neil on January 26, 1982 as a result of a cocaine transaction with a government informant. Approximately one hundred pounds of cocaine was seized when Beahm was arrested outside of the apartment of O'Neil in Los Angeles, California.

On January 29, 1982, FBI agent Harmon and DEA agent Wood talked with Fred Beahm while he was being held in the U.S. Marshal's detention cell at the United States Courthouse in Los Angeles. They knew that Beahm had been formally charged and was represented by counsel. No *Miranda* warnings were given, and no attempt was made to contact Mr. Beahm's lawyer before or during this conversation. Beahm asked the agents whether they had yet searched his boat, called the "Andalon." When the agents replied negatively, Beahm invited them to conduct a search because the boat "was clean." Beahm also gave the agents the harbor name and slip number where the boat was anchored, and told them where they could find the key to gain entry. The agents immediately proceeded to the vessel at King Harbor, Slip I–17, Redondo Beach, California. There, they found and seized documents, together with an aviator's flight log book containing one $1,000 Federal Reserve Bank note.

The documents seized in that search were described in an affidavit submitted to a United States Magistrate in the United States District Court for the Central District of California on February 2, 1982, for a search warrant to search the offices of Coast Finance at 911 Studebaker Road, Suite 275, Long Beach, California. (Plaintiff's Exhibit 1). Documents seized as a result of the search conducted in the execution of that search warrant were then used for the further investigative procedures described later in this Memorandum Opinion and Order.

F. Joseph Mackey, III, Asst. U.S. Atty., Denver, Colo., for the Government:

Victor L. Abbo, Robert W. Cook, Boulder, Colo., Anthony P. Brooklier, Beverly Hills, Cal., for defendant William C. Musson.

Joseph Saint-Veltri, Denver, Colo., for defendant Gary E. Mintz.

Rowe P. Stayton, Denver, Colo., Richard G. Sherman, Los Angeles, Cal., for defendant William F. Van Nuys.

The defendants now before this court contend that the search of the Andalon was not pursuant to a voluntary consent by Fred Beahm and, therefore, the fruits of the search should be suppressed because the search was conducted without a warrant and without probable cause. The government challenges the defendants' standing to contest the validity of the boat search. William Van Nuys asserts a privacy interest in the Beahm boat protected by the fourth amendment. Van Nuys testified that he had often used the Andalon as an office to work away from his regular office on matters relating to Coast Finance, to Fred Beahm, and to businesses in which Van Nuys and Beahm had interests. Van Nuys said that in exchange for the use of the boat, he did consulting and accounting work for Beahm.

It is this court's view that the evidence does not support a reasonable expectation of privacy by William Van Nuys in the Andalon. The evidence is undisputed that the Andalon was the sole property of Fred Beahm, and that he made it his principal residence, living there alone. Beahm kept the key to the cabin hidden under a sponge in a locker for propane next to the entryway, and he told Musson, Mintz and Van Nuys where that key was to give them access to the boat at any time.

Beahm testified that he recalled that Van Nuys left a box of records on the boat six months or so before the search, and that he, Beahm, assumed that Van Nuys was using the boat as an executive officer of Coast Finance, to do work there for that company. Beahm also testified that he thought O'Neil told the agents of the existence of the boat at the time of the arrest at O'Neil's residence, and this concerned him because he thought the agents would tear it up in a search.

The documents seized in the boat search have been put into evidence as Exhibit 22. None of those records suggests, on its face, that it is the sole property of any of the defendants now before the court.

■ To challenge a search and seizure on fourth amendment grounds, a defendant must prove that he had a reasonable expectation of privacy in the place searched or the items seized. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Payner,* 447 U.S. 727, 731–32, 100 S.Ct. 2439, 2443–44, 65 L.Ed.2d 468 (1979). A "defendant's rights are violated only when the challenged conduct invaded *his* legitimate expectations of privacy rather that of a third party's." *United States v. Payner,* 447 U.S. at 731, 100 S.Ct. at 2444. The Supreme Court has stated that "[L]egitimization of expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois,* 439 U.S. 128, 144, 99 S.Ct. 421, 431, 58 L.Ed.2d 387 (1978). In assessing the defendants' expectations of privacy, the court looks to the totality of the circumstances. *See, e.g., Rawlings,* 448 U.S. at 104, 100 S.Ct. at 2561; *United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981).

■ In support of his argument that he has the right to challenge the search of the Andalon, Van Nuys cites *United States v. Robertson,* 606 F.2d 853 (9th Cir.1979), and *United States v. Salvador,* 740 F.2d 752 (9th Cir.1984). In *Robertson,* the court found that the defendant [Robertson] had a reasonable expectation of privacy in his cousin's [Redick] home because "Both parties apparently believed that Robertson has standing to challenge the search of Redick's home. Although he did not have a proprietary interest in the house, he did have such an interest in the items seized in the search: his clothing and his person. Robertson was also an overnight guest in the Redick home. He had already spent at least one night there and had stored his personal belongings in the room in which he was found." *Robertson,* 606 F.2d at 858, f.n. 2. Van Nuys, however, does not have such a possessory interest in the documents seized. They include statements for securities trading addressed to Fred Beahm; tax returns for partnership proper-

ties, in each of which Fred Beahm held an interest; Fred Beahm's flight log; cancelled checks and other receipts of Fred Beahm's that look as if they were gathered for the purpose of preparing tax returns; and a lease agreement to which Fred Beahm was a party. These types of items differ fundamentally from the clothes seized in *Robertson.*

*Salvador* does not support Van Nuys' position. There, the court held that two defendants had a reasonable expectation of privacy in their relatives' home, stating that the defendants "had stayed at their relatives' house overnight and for longer periods on prior occasions. They also kept personal belongings at the residence. Appellants gave at least one person the relatives' telephone number as a place to be contacted. Appellants' child was babysat by a neighbor at the house." *Salvador,* 740 F.2d at 755. In a sense, the defendants in *Salvador* established that the home searched served as their second home. Based on the testimony at the evidentiary hearing, Van Nuys did not establish such a close connection with the Andalon. Van Nuys and Beahm are not related. More importantly, however, Van Nuys never indicated that he kept any personal effects on the boat.

A comparison of Van Nuys' position with that of a defendant in *United States v. Haydel,* 649 F.2d 1152 (5th Cir.1981), is helpful. There, the court found that the defendant, Haydel, had standing to challenge a search of his parents' home. The court first summarized the law relating to reasonable expectations of privacy. Stating that property ownership is not determinative, the court recited other relevant factors including, "whether the defendant has a possessory interest in the thing seized or the place searched, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." *Id.* at 1155. After setting forth these factors the court concluded that Haydel had a legitimate expectation of privacy with re-

spect to documents he stored in his parents' home because "Haydel's parents had given him permission to use their home and had given him a key. His access, therefore, was unencumbered. Although he did not reside regularly at his parents' home, he kept clothing there and had occasionally remained overnight. Moreover, he conducted a significant portion of his gambling activities at the home and owned the records that were seized.... it is reasonable to assume that Haydel had the authority to exclude persons other than his parents and their guests from the home." *Id.* at 1155.

Van Nuys knew where Beahm hid the key to the boat, and he said he sometimes spent the night on the boat. Because others also knew where Beahm hid the key, it appears that Van Nuys did not have the authority to exclude persons from the boat. Moreover, it is not altogether clear that Van Nuys' access to the boat was unencumbered. Indeed, he indicated that he usually stayed on the boat when Beahm was out of town. Thus, Van Nuys' access was at least in part dependent upon Beahm's travel plans. Secondly, unlike Haydel, Van Nuys did not own the records that were seized. Though he may have gathered them together on the Andalon to help Beahm with managing his business, the documents belonged to Fred Beahm. Finally, because others knew how to gain access to the boat, it is difficult to conclude that Van Nuys took normal precautions to maintain his privacy. See, *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2561. In fact, Van Nuys failed to prove that there was any identifiable area on the boat that was for his private use. The combination of the nature of the documents seized, the indefiniteness of the arrangement Van Nuys and Beahm had with respect to the use of the boat, and the uncertainty with respect to Van Nuys' private area, leads this court to conclude that, based on the totality of the circumstances, Van Nuys did not have a reasonable expectation of privacy in the Andalon or the documents seized from it.

■ Musson and Mintz argue they have a reasonable expectation of privacy because of their relationship with Fred Beahm. They cite *United States v. Quinn*, 751 F.2d 980 (9th Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 1623, 89 L.Ed.2d 803 for the proposition that one joint venturer has standing to complain of illegal searches directed at another joint venturer on the basis of their special relationship. The holding in *Quinn* is far narrower. There, the court held that an absentee owner of a boat, involved in a joint venture smuggling marijuana, had standing to contest the search of the boat for marijuana. The boat owner also had a possessory interest in the marijuana seized. The court said that "Where a joint venture is being pursued, the mere fact of a joint venturer's absence from the place searched is insufficient to establish *abandonment* or *relinquishment* of the property seized." *Id.* at 981 (emphasis added). Here, Musson and Mintz failed to produce any evidence that the Andalon was anything more to them than a space to be occupied intermittently for purposes which may or may not relate to the interests of the boat's owner.

■ Musson and Mintz also contend they can complain of the alleged violations of Beahm's sixth amendment rights "on the basis that Sixth Amendment rights are currently more guarded than Fourth Amendment rights almost to the extent that codefendants in an enterprise conspiracy have the automatic right to complain of Sixth Amendment violations suffered by the enterprise confederates." Defendants Musson and Mintz Brief in Support of Motions to Suppress, p. 6. As support for their argument, Musson and Mintz cite, and then attempt to distinguish, *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). In *Payner*, the Supreme Court held that the defendant could not complain of a search violative of the fourth amendment because the governmental conduct was directed at some third party. Musson and Mintz argue that Beahm's sixth amendment right to counsel was violated, that the right to counsel is more fundamental than the rights guaranteed by the fourth amendment, and therefore the standing principle enunciated in *Payner* is inapplicable where a third party's sixth amendment rights, rather than fourth amendment rights, are violated. This argument is completely untenable. The sixth amendment right to counsel is personal, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and its alleged violation as to Beahm does not give Musson or Mintz standing to challenge the search of the Andalon. *See, e.g., United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822.

Assuming the existence of standing, was the boat search illegal? Agents Wood and Harmon both testified that they obtained consent from Fred Beahm, and that he signed a written consent to search form. The government has not been able to produce that form, a copy of it, or to explain satisfactorily the disappearance of it. The form is referred to in a report of investigation prepared February 10, 1982, and in a DEA Form—7a prepared by agent Wood to record the items seized as evidence. The defendants have submitted an affidavit from an attorney who represented Mr. Beahm in defending charges in California in 1982, and that attorney does not recall that a consent to search form was ever shown to him. While the absence of the form seems to be a curious omission from the extensive documentation made in this investigation, this court is unable to infer sinister conduct.

■ Fred Beahm did not deny that he gave consent; he said that he had no recollection of such consent or a consent to search form. He also said that he didn't "know anything for sure." The agents' testimony is corroborated by the fact that Fred Beahm was interested in protecting the boat from being "torn up" in a search, and he thought it was clean because he thought they were only looking for more cocaine. Additionally, even if O'Neil told the agents about the existence of the boat, there is nothing in evidence to show that

they knew where it was, or how to obtain entry to it without having been told by Beahm on January 29, 1982. In considering the conduct and demeanor and manner of the witnesses, and also considering the interest of Mr. Beahm as identified with that of the defendants, this court finds that the testimony of agents Wood and Harmon is credible, and that a consent to search was given.

The defendants challenge the voluntariness of that consent, contending that the conversation with Beahm while he was in custody and without his lawyer present was a violation of his fifth and sixth amendment rights. The defendants also contend that the scope of the search exceeded the consent, and rely on *United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971). While Beahm was probably referring to drugs when he said that the boat was "clean", he did not limit his consent to the seizure of drugs alone. Beahm was in custody on drug charges and was not naive about the inquisitiveness of federal investigators. The findings that Van Nuys did not have exclusive control of any area of the boat and the documents defeat the contention that Beahm's consent was not effective.

### 1982 Search of Coast Finance

Plaintiff's Exhibit 1 is a search warrant for the search of Coast Finance, 911 Studebaker Road, Suite 275, Long Beach, California, dated February 2, 1982, pursuant to which a search of those premises was conducted on February 3, 1982, resulting in the seizure of seven boxes of records, fifty-four diskettes, and a computer operation manual. FBI agent Michael E. Harmon signed the affidavit for this warrant. Agent Harmon incorporated an affidavit of DEA agent John M. Valestra, describing the information and events leading to the arrest of O'Neil and Beahm in January, 1982. Agent Harmon's affidavit includes information from confidential informants, the information obtained in the execution of a search warrant at O'Neil's residence, and the consent search of the Andalon.

The defendants' principal assault on this search warrant affidavit is that it is tainted from the allegedly illegal search of the Andalon. That argument, of course, has been foreclosed by this court's decision with respect to the boat search.

■ The defendants also contend that the warrant is an "all records" warrant which is overbroad on its face under *Voss v. Bergsgaard,* 774 F.2d 402 (10th Cir. 1985). The information contained in the affidavit, upon which the warrant is based, supports agent Harmon's conclusion that records and documents on the premises of Coast Finance will show that those named in the warrant used the facilities to conceal the existence and nature of narcotics trafficking and money laundering. The scope of authorization is consistent with the conclusions in the affidavit. The warrant describes with particularity the items to be searched for and seized, namely:

documents and records in the names of Fred Beahm, Thomas O'Neil, Becky Neuman, V.P. Associates, O'Neil Development Company, Toll Associates, O'Neil Associates, Fred Young, William Van Nuys, By-Air Aviation [i]ncorporated, By-Air Flying Club, Third (3rd) Street [p]roperties, J and B Enterprises, dba Colonial Apartments, Gary Mintz, or Financial Management Services, Inc., includ [sic] but not limited to certificates of deposit, loan files, evidence of ownership of safe deposit boxes and their contents, deposit and withdrawal items, correspondence, memoranda, cash in currency and/or coin, checks, ledgers, cashier's checks, receipts and any records or writings of whatsoever nature showing any business or financial transactions in the name of, or for the benefit of, any of the previously-mentioned individuals or entities.

Although the list of records is extensive and includes correspondence, checks, ledgers, etc., the scope is limited since all documents and records must be in the name of, or for the benefit of, the named individuals and entities. In *Voss v. Bergsgaard, supra,* the Tenth Circuit Court of Appeals

examined a warrant which authorized the seizure of an organization's customer files, bank records, employee records, precious metals, marketing and promotional literature, and literature relating to communications among persons conspiring to defraud the Internal Revenue Service. Noting that there was no probable cause to believe that fraud pervaded every aspect of the organization's activities, and that seizure of some of the records described would implicate first amendment rights, the court held that the warrant was overbroad. Unlike the warrant at issue in *Voss*, the warrant to search Coast Finance in 1982 was not a general records warrant since it limited the documents subject to seizure to those in the name of, or for the benefit of, particular individuals and entities.

Van Nuys also cites *United States v. LeBron*, 729 F.2d 533 (8th Cir.1984), in support of his contention that the warrant is overbroad. There, the Eighth Circuit Court of Appeals held that a search warrant authorizing a search and seizure of "any records which would document illegal transactions involving stolen property" was overbroad. The court expressed the concern that a warrant with such broad language failed to "guide the officers in the execution of the warrant or to limit their discretion." *Id.* at 537. The warrant authorizing the search of Coast Finance did not contain such broad language. Only documents referring to those people and entities named in the search warrant were subject to being seized. The warrant described the documents and records with sufficient particularity that the agents executing it had adequate guidance.

█ Mintz also contends that the agents executing the warrant exceeded the scope of their authority in seizing computer disks not described in the warrant. In *United States v. Reyes*, 798 F.2d 380 (10th Cir. 1986), the Tenth Circuit Court of Appeals addressed this issue. *Reyes* involved a challenge to a search warrant which authorized seizure of drug trafficking records, ledgers and writings. In executing the warrant, agents also seized a cassette tape, and the defendant argued that the agents exceeded the scope of their authority because the warrant did not specifically authorize the seizure of a cassette tape. The court found that the agents did not search beyond their authority stating that "in the age of modern technology and commercial availability of various forms of items, the warrant could not be expected to describe with exactitude the precise form the records would take." *Id.* at 383. The court agreed with the trial court's conclusion that "in modern times because 'business records are increasingly being kept on audio or video tape ... the law enforcement officers knew that the records they were seeking might well be contained on [the] tape.'" *Id.* at 382–83.

In light of the language of the search warrant, and the authority discussed above, it is this court's view that the warrant is not overbroad, and the agents executing it did not exceed the scope of their authority.

### 1985 Search of Coast Finance

Records obtained in the execution of the 1982 search warrant at Coast Finance were used in a subsequent investigation conducted by the U.S. Customs Office of Investigation, the Internal Revenue Service, the Drug Enforcement Administration, and the FBI. A grand jury impanelled in San Diego, California was used in the course of this investigation. A grand jury subpoena was served on Frederick William Young, who was then interviewed on March 7, 1984, by DEA agent Franklin Smith, with IRS agent Martinez, DEA agent Guinn, and others. Mr. Young had been president of Coast Finance from July, 1978 until 1980. He informed that Coast Finance was a shell corporation which Van Nuys purchased, and that while Young was working in the company he gradually became aware of the sources of money coming into it. He concluded that the company was being used in connection with drug transactions. Mr. Young kept certain records and made copies of corporate records which he turned over to the investigating agents. The in-

formation from Young and from these records was included in an affidavit of agent Smith, Plaintiff's Exhibit 2, used to obtain a search warrant for premises at 5287 East Second Street, Long Beach, California, to search for and seize records of Coast Finance.

The defendants contend that Fred Young stole these records and that the government's use of them was, therefore, illegal. A wrongful search or seizure by a private party does not violate the fourth amendment, unless the private party acts as an instrument or agent of the state in effecting the search or seizure. See, *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Walther*, 652 F.2d 788 (9th Cir.1981). The test is whether Fred Young, "in light of all the circumstances of the case, must be regarded as having acted as an 'instrument or agent of the state'" when he obtained the records from Coast Finance which he gave to the investigating authorities. *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). Fred Young acquired the documents while he was the president of Coast Finance from July 1978 to 1980. At the evidentiary hearing, agent Martinez of the IRS testified that Mr. Young said he kept a copy of some records from Coast Finance for his own protection. A review of these records, Defendants' Exhibit L, shows that Fred Young prepared some of these records. Mr. Young did not give the records and documents to investigating authorities until 1984, well after he acquired the documents. Fred Young was not acting as an agent or instrument of the government when he acquired the documents, and the defendants cannot argue that the investigating authorities acquired the documents in violation of the fourth amendment. Therefore, the defendants' reliance on *Segura v. United States*, 663 F.2d 411 (2nd Cir.1981), *aff'd. on other grounds*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 is misplaced. There, the court held that evidence discovered after an unlawful entry but before issuance of a valid search warrant was inadmissible notwithstanding that it was not actually seized until after the issuance of the warrant. Here, unlike *Segura*, if any prior illegal acts took place, they were committed by Fred Young and not by the investigating agents.

On August 25, 1985, the defendants moved to suppress the financial records obtained from Fred Young, while acting as the president of Coast Finance, on the ground that because the records were financial in nature, they were subject to the requirements set forth in the Financial Privacy Act, 12 U.S.C. §§ 3401–3422. In particular, the defendants argue that the records were not "presented" to the grand jury in conformance with section 3420. Section 3420 is not applicable. It requires presentment only when records are obtained from a financial institution. Although acting as an agent of Coast Finance and its customers when he was employed there, Fred Young was not acting as an agent when he gave the documents to agents Smith and Martinez. Moreover, the Act only provides for civil remedies in the event of a violation. As set forth in 12 U.S.C. § 3417(d), "The remedies and sanctions described in this chapter shall be the only authorized judicial remedies and sanctions for violation of this chapter." Recently, the Ninth Circuit Court of Appeals refused to exclude evidence obtained in violation of the Act under its inherent supervisory powers. *United States v. Frazin*, 780 F.2d 1461 (9th Cir.1986).

The defendants also argue that the information contained in the 1985 search warrant is stale, noting in particular that the information gleaned from the documents from Fred Young referred to transactions from 1978 to 1980. The records from Fred Young did not form the sole basis for the probable cause determination. The affidavit of agent Smith includes statements from confidential informants and a host of other people who knew Musson, Mintz and Van Nuys. The affidavit states that interviews with these people occurred in 1983 and 1984. Additionally, agent Smith stated

in the affidavit that in March 1985, he and agent Guinn discovered that a car driven by Van Nuys was registered to Coast Finance, Inc., and that a certain telephone number was answered "Coast Finance." The telephone number was an unlisted number subscribed to by Long Beach Realty, 5287 East Second Street, Long Beach, California. Finally, the affidavit stated that the office of Coast Finance was in a single-story commercial building which bore a sign reading "Long Beach."

■ To obtain a search warrant it is necessary to establish that certain items are probably located at the search site. *United States v. Tehfe,* 722 F.2d 1114, 1119 (3rd Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154. The likelihood that evidence sought is still in place and, hence, that information in support of the warrant is not stale, depends on a number of factors including the nature of the criminal activity, of the suspect, of the thing to be seized, and of the place to be searched. *Id.* at 1119; *United States v. Johnson,* 461 F.2d 285 (10th Cir.1972). The Tenth Circuit Court of Appeals has given guidance concerning the analysis of a staleness issue. In *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972), the court said that:

> It is fundamental that the law of probable cause has been developed in an attempt to prevent the issuance of a search warrant on the basis of vague and uncertain information. It is also fundamental that the element of time is crucial to the concept of probable cause.... Initially, it should be noted that the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indi-

cating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

Similarly, in *United States v. Sherman,* 576 F.2d 292, 296 (10th Cir.1978), *cert. denied,* 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259, where the defendants were charged with conspiring to violate copyrights of sound recordings, the court said that "the nature of the activity must be taken into consideration, and when the activity is of a protracted and continuous nature the passage of time diminishes in significance." More recently, in *United States v. Reyes,* 798 F.2d 380, 382 (10th Cir.1986), where the defendant was charged with conspiring to possess cocaine with the intent to distribute, the court, in response to a challenge of the affidavit on the grounds of staleness, cautioned that:

> Timeliness is not determined by counting the number of days or months between the occurrence of the facts relied upon and the issuance of a warrant ... Instead, timeliness depends upon the nature of the underlying circumstances and concepts.... Moreover, 'when the activity is of a protracted and continuous nature the passage of time diminishes in significance.' ... In this case the facts alleged in the affidavit pointed to an ongoing conspiracy. Under the totality of the circumstances, given the allegations of repeated drug offenses at several month intervals, the Court finds that the information upon which probable cause was based was not impermissibly stale.

■ Given the nature of the criminal activity that was being investigated, particularly the operation of and participation in a continuing criminal enterprise, it was not unreasonable for the magistrate to rely on statements made in 1983 and 1984, and records dated in the late 1970s and early 1980s, to conclude that there was probable cause that the office of Coast Finance would contain records documenting the illegal activity described in the warrant.

■ The defendants also contend that the search warrant was overbroad in that it

authorized an "all records" search impermissible under *Voss v. Bergsgaard,* 774 F.2d 402 (10th Cir.1985). The 1985 search warrant for Coast Finance essentially does authorize the seizure of all the records of Coast Finance. However, when there is probable cause to believe that every aspect of a business is pervaded by a scheme to defraud, a warrant may be obtained authorizing seizure of all of the records of a business. *United States v. Offices Known as Fifty State Distributing Co.,* 708 F.2d 1371 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *United States v. Brien,* 617 F.2d 299 (1st Cir.1980), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273. The affidavit in support of the 1985 Coast Finance warrant included information from Fred Young, three confidential informants, and others who had personal or business relationships with Musson, Mintz and Van Nuys. When viewed in its entirety, this information supports a finding of probable cause to believe that Coast Finance was operated primarily for the purpose of laundering money.

Moreover, the specificity requirement is somewhat relaxed where, as here, a complex scheme is being investigated. In *United States v. Wuagneux,* 683 F.2d 1343 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83, the defendant, convicted of operating a business through a pattern of racketeering activity, embezzlement of employee funds, mail fraud and bank fraud, challenged a search warrant on the grounds that it was not sufficiently particular. The court stated that "in cases such as the one before us involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails the awareness of the difficulty of piecing together the 'paper puzzle.'" *Id.* at 1349. The Supreme Court, too, has suggested that the specificity requirement is necessarily relaxed when a complex scheme is under investigation, since the whole scheme can only be shown "by placing in the proper place the many pieces of evidence that, taken singly, would show com-

paratively little." *Andresen v. Maryland,* 427 U.S. 463, 481 n. 10, 96 S.Ct. 2737, 2749 n. 10, 49 L.Ed.2d 627 (1975).

### Search of William Musson's Residence In Hawaii

Plaintiff's Exhibit 7 is a search warrant, issued on January 22, 1985, authorizing a search of Musson's home on Maui, Hawaii. The affidavit in support of the warrant, in large part, contains the same information as the affidavit in support of the 1985 search warrant for Coast Finance. The affidavit was prepared by DEA agent Franklin Smith and incorporates an affidavit submitted to obtain a search warrant for John Zell's residence in Hawaii. John Zell was indicted with Musson, Mintz and Van Nuys.

The affidavit includes information from Mr. Young and the records he kept as discussed above. The affidavit also contains information from three confidential sources detailing the drug and financial transactions of each of the defendants. John Stanley, in an interview with agents Smith, Canty, Romero and Guinn on November 29, 1984, provided information about Musson's drug and financial transactions that was also included in the affidavit. The affidavit reports that in August of 1984, Musson told Stanley that he was investing his money in gold coins. Stanley also told agent Smith that he borrowed $75,000 from Musson in October 1983, and that Musson sent him the money in cashiers checks, each not exceeding $9,999. Agent Smith also included information that Musson's parents told two IRS special agents on September 4, 1984 that their son, William Musson, never received any inheritance from the family, and did not receive any substantial gifts of money or property. Furthermore, Musson's father stated that he knew his son was not working anywhere. Information obtained from a gold dealer, Robert Karler, was also included in the affidavit. He described transactions with the defendants who purchased gold coins from him on a regular basis. In February 1984, Karler sold ten $10 gold

pieces for William Musson and issued checks from the proceeds to Musson, Mintz and Zell.

In addition to the information in the affidavit described above, agents Smith and Guinn traveled to Maui, Hawaii in December 1983 to obtain evidence concerning William Musson. The affidavit describes the results of this investigation, including a description of the location of Musson's home and his daily activities. A pen register, placed on Musson's phone, revealed that Musson maintained contact with Mintz and Zell. During the month of March 1984, Musson's mail was subject to a mail cover. These results were included in the affidavit. Finally, agent Smith included information in the affidavit regarding a mail cover that ran from January 17, 1985 to January 21, 1985. All this information supports agent Smith's conclusion that Musson was involved in a large scale cocaine smuggling, processing and distribution organization, and that he was involved in a sophisticated money laundering scheme.

Musson contends that the evidence obtained from the search of his home should be suppressed for several reasons. First, he argues that the affidavit fails to establish probable cause that he still lived in the house where agents Smith and Guinn observed him in 1983 when the search was executed on January 25, 1985. In support of his contention, Musson argues that the fact he was observed in his home in 1983, and had mail sent to that address in 1984, but in 1985 had mail sent to a post office box, supports an inference that he was no longer living at the 1983 residence. The 1984 mail cover was for Musson's home in Makaweo, Maui, Hawaii. The 1985 mail cover was for a post office box also in Makaweo, Maui, Hawaii. Though different locations, it was not unreasonable for the magistrate to conclude that Musson lived at the same residence. The use of a post office box does not raise an inference of a change of address.

Musson argues that the information obtained from the 1985 mail cover must be deleted from the affidavit because the mail cover was retroactively voided by postal authorities due to the government's failure to comply with 39 C.F.R. § 233.3. On August 29, 1986, agent Canty testified at the evidentiary hearing that postal authorities approved agent Purvis' January 15, 1985 oral request for a mail cover. Agent Canty testified that agent Purvis was under the impression that she had ten days to confirm the request in writing. On January 25, 1985, a formal written request was sent to postal authorities. An employee in the Postal Inspector's office wrote on this letter "Requested Corrected Copy of Letter from Agent not Received; Cover effected. All documents destroyed." In the meantime, though, postal inspectors communicated information to agent Purvis regarding Musson's mail.

■ Though the mail cover was voided, a surveillance of mail does not constitute a search protected by the fourth amendment, and therefore evidence obtained pursuant to it should not be suppressed. In *United States v. Chaote*, 576 F.2d 165 (9th Cir. 1978), *cert. denied*, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344, the court held that a mail cover did not violate the fourth amendment, noting that senders and recipients of mail waive any expectation of privacy with respect to writing on the outside of mail, knowing that postal employees will be handling the mail. *Id.* at 177. Though the court there determined that the mail cover request satisfied the applicable postal regulations, *Id.* at 173, that finding was not necessary for the court's conclusion. Rather, the holding was predicated upon a finding that the particular mail cover was reasonable under the fourth amendment, compliance with the regulations being evidence of that. *Id.* at 177. Here, agent Purvis made an oral request for the mail cover, reasonably believing that a later written request would satisfy the regulations. Even if the mail cover is a search within the meaning of the fourth amendment, this court finds that this particular mail cover was reasonable, and therefore evidence obtained pursuant to it shall not be suppressed.

Moreover, this case is factually similar to *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), where the Court refused to apply the exclusionary rule to evidence obtained in violation of IRS regulations. There, an IRS agent recorded conversations with a taxpayer while conducting an audit of that taxpayer. During the course of the audit, the taxpayer offered to pay the agent for a favorable resolution of the audit. Subsequently, the taxpayer was prosecuted for bribing the IRS agent, and at trial he moved to suppress the recordings on the ground that the authorizations required by IRS regulations had not been secured. The Court, noting that the Constitution and federal statutes do not require official approval before conversations are recorded by government agents with the consent of one of the conversants, stated:

Regulations governing the conduct of criminal investigations are generally considered desirable, and may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence in criminal trials. Although we do not suggest that a suppression order in this case would cause the IRS to abandon or modify its electronic surveillance regulations, we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures.... In the long run, it is far better to have rules like those contained in the IRS manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.

*Id.* at 755–56, 99 S.Ct. at 1473. As in *Caceres*, the agency action here, "while later found to be in violation of the regulations, nonetheless reflected a reasonable, good-faith attempt to comply in a situation in which no one questions that monitoring was appropriate and would have received

... authorization, had the request been received more promptly." *Id.* at 757, 99 S.Ct. at 1474.

Furthermore, the Court has indicated that the purpose of the exclusionary rule is to deter unlawful police conduct, and that when this purpose is not served, the contribution of the exclusionary rule to the effectuation of the fourth amendment is minimal as compared to the societal costs of applying the rule. *See, e.g., United States v. Leon*, 468 U.S. 897, 907, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1983) (holding that the exclusionary rule should not be applied to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid, and stating that whether to apply the rule is "resolved by weighing the costs and benefits of preventing the use in the prosecution's case-in-chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that is ultimately found to be defective"); *Stone v. Powell*, 428 U.S. 465, 493, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1978) (holding that a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial, and stating that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in the relation to the costs.... In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of the application persist with special force"). This balancing approach dictates that the exclusionary rule should not be applied in this case since the postal employees and the investigating agents reasonably, and in good-faith, believed that the applicable postal regulations would be satisfied with the subsequent written request.

Musson contends also that the information contained in the affidavit is too stale to support a finding of probable cause. The

affidavit supports the inference that Musson's assets were tied to criminal activity, the criminal activity was of continuous and protracted nature, and therefore, under *United States v. Johnson,* 461 F.2d 285 (10th Cir.1972), and its progeny, Musson's claim is without merit.

Finally, Musson contends that the search warrant fails to describe the location of his residence with sufficient particularity that the executing agent could locate it. Two descriptions appear on the face of the warrant. One of them gives the road and intersection of the location of the house, stating that it is the only residence located at that intersection. That description also refers to Highway 37, the only Highway 37 located on the Hawaiian islands. The second description describes the residence itself, stating that it has "a brown shingle roof, redish brown wood siding, rear porch with wood railing, stained glass windows in rear, light green wood trim at top with cement basement. Front door faces Mauka with a dirt driveway and no garage." This second description also stated that the residence is located in the District of Hawaii. Attached to the warrant was a photograph of Musson's home. At the evidentiary hearing, Musson testified that his house was not located in the same subdivision described in the affidavit, that his house looked similar to other houses nearby, and that no road with the name of the road appearing on the face of the warrant existed on the island of Maui.

■ The fourth amendment requires that a search warrant describe the premises to be searched to enable the searching officer to ascertain and identify the site with reasonable effort. *United States v. Weinstein,* 762 F.2d 1522, 1532 (11th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1519, 89 L.Ed.2d 917. An erroneous description of the premises to be searched does not necessarily invalidate a warrant. *Id.* at 1532; *United States v. DePugh,* 452 F.2d 915, 920 (10th Cir.1971). Moreover, the knowledge of the executing officer can be taken into account even though it is not set forth in the warrant or affidavit. *Unit-*

*ed States v. Burke,* 784 F.2d 1090, 1092–93 (11th Cir.1986); *United States v. Weinstein,* 762 F.2d at 1532–33.

■ At the evidentiary hearing, agent Purvis testified that she had no difficulty locating Musson's home. She stated that agent Guinn accompanied her when she executed the warrant, and he knew the house because he and agent Smith conducted surveillance of it in 1983. The situation is quite analogous to that in *United States v. Burke,* 784 F.2d 1090. There, the wrong address appeared on the search warrant, but the agent who made the affidavit to obtain the warrant pointed out to the agent executing the warrant where the premises to be searched were located. The court held that "In evaluating the effect of a wrong address on the sufficiency of a warrant, this Court has also taken into consideration the knowledge of the officer executing the warrant, even where such knowledge was not reflected in the warrant or the affidavit supporting the warrant." *Id.* at 1092–93. Similarly in *United States v. Weinstein,* 762 F.2d at 1533, where a search warrant erroneously described the entrance leading to the premises to be searched, the court found it significant that "the agent conducting the searches testified that he had been to the premises before and that he had no doubt which door gave access" to the premises. With the aid of the description of Musson's home on the search warrant, a photograph of Musson's home and the company of agent Guinn, agent Purvis had no difficulty locating Musson's home. Even without considering agent Guinn's assistance, the warrant would direct a reasonably prudent person to Musson's residence. The warrant directed the searching officer to Highway 37, and Musson conceded that the only Highway 37 on the Hawaiian islands was located on Maui. Though the house is located on Kula road, and not "Kaula" road as stated in the affidavit, from the entire description given, and with the aid of a photograph, an executing officer could locate the premises. Moreover, Maui residences do not have street addresses, so the descrip-

tion's specificity must necessarily be judged differently. In sum, this court finds that, despite the ambiguities regarding the location and description of Musson's home, the warrant was nonetheless sufficient under the fourth amendment.

■ William Musson argues that a diary seized from his home should be suppressed on the grounds that it was not a business record and that agents executing the warrant would have to thoroughly review the diary to determine whether it could be seized as evidence. The search warrant, in the section entitled "Property to be Seized," specifically provides that items relating to travel are subject to seizure and further states that "Evidence of such travel is often times maintained by narcotics traffickers in the form of airline receipts, vehicle rental receipts, credit card receipts, travel schedules, *diaries*, hotel receipts, travel agency vouchers, notes and records of long distance telephone calls." The first page of Musson's diary describes travel plans, and from merely glancing at it, the executing agents could determine that pursuant to the search warrant, they were authorized to seize it. Moreover, the warrant also authorized seizure of a "Manuscript of a proposed novel reportedly written by William Compton Musson, using an unknown pseudonym, which details Musson's and his organizations illicit narcotics related activities since its inception ..." Taken together, these portions of the search warrant support the seizure of Musson's diary. The admissibility of all or any portions of the diary will be determined at the time of trial, if and when offered.

### 1985 Search of William Musson's Property in Nebraska

Plaintiff's Exhibit 11 is a search warrant authorizing a search of William Musson's property in Nebraska and the seizure of currency, gold coins, and financial instruments. The warrant was issued and executed on February 5, 1985. The affidavit in support of the warrant, prepared by agent Smith, includes information from confidential sources, John Stanley, Robert Karler, Fred Young and prior searches, including the January 25, 1985 search of Musson's home in Maui, Hawaii. The affidavit makes reference to Musson's practice of burying currency and gold. A copy of Musson's diary, seized from his home in Hawaii, was attached to the affidavit. In the diary there is a reference to the Nebraska property and a map showing where gold was buried on that property.

■ Musson challenges the warrant and search on two grounds. First, he argues that the affidavit contains stale information regarding his involvement in alleged past criminal conduct, and that it does not establish any nexus between that alleged conduct and "fruits thereof" to his property in Nebraska. On the contrary, Musson's diary indicates gold was buried on the Nebraska property. Even though the diary entry was dated 1982, from all the information contained in the affidavit, the magistrate could reasonably conclude that Musson was a faithful record keeper and that had he moved the gold from his Nebraska property, he would have recorded that as well. Thus, in light of the criminal activity being investigated and the line of cases beginning with *United States v. Johnson*, 461 F.2d 285 (10th Cir.1972), discussed above, this court finds that the information contained in the affidavit is not too stale to support a finding of probable cause.

With respect to his contention regarding staleness, Musson argues that this court should analyze the affidavit for a probable cause determination without the information from the Hawaii search because that was illegal, or at least without regard to information obtained from the diary, because that should not have been seized in any event. As discussed above, the search of Musson's home in Hawaii was proper, as was the seizure of his diary. It is proper that information from these sources was included in the affidavit.

■ Secondly, Musson contends that the warrant is invalid because the description of the property on the face of the

warrant is not an accurate description of the property Musson owns in Nebraska. As discussed above, a warrant needs to describe the property to be searched with sufficient particularity that a searching officer with reasonable effort can ascertain and identify the place intended. *United States v. Weinstein*, 762 F.2d at 1532. The description in the warrant does not need to meet the technical requirements sought by conveyancers, *United States v. Burke*, 748 F.2d at 1092, and an erroneous description does not necessarily render a warrant invalid. *United States v. DePugh*, 452 F.2d at 920.

 Although the legal description of Musson's property is incorrect, the warrant describes the county where the property is located, and which township and range within which it is situated. Agent Smith also stated in the affidavit that he knew Musson owned "640 acres in or near Crawford, Nebraska, in conjunction with John, Patricia and Agnes Zell," and that he was familiar with the terrain and knew it to be similar to the description of terrain contained in Musson's diary. Finally, Musson's diary, attached to the affidavit, includes a map of the property and indicates where Musson buried the gold. This physical description of the property contained in Musson's diary served to aid agent Smith in locating the property, as he stated in the affidavit. In light of all the information contained on the face of the warrant and in the affidavit, this court finds that the warrant identified Musson's property with sufficient particularity.

### 1985 Search of William Musson's South Dakota Residence

Plaintiff's Exhibit 10 is a search warrant authorizing a search of William Musson's house in South Dakota. The warrant was granted and executed on February 6, 1985. The affidavit in support of the warrant is virtually identical to the affidavit in support of the warrant for Musson's Nebraska property.

Musson challenges the warrant for and search of his South Dakota residence on the same grounds as he does the Nebraska warrant and search; namely, he raises the issues of staleness and particularity with respect to the description of the property. For the reasons given above, this court finds that the argument with respect to staleness is without merit. As to the description of the place to be searched, Musson contends that the description on the face of the warrant is not that of the place where his South Dakota home is located. Musson testified at the evidentiary hearing that he owned two parcels of land in South Dakota, that the two parcels were not contiguous, that only one parcel has a dwelling on it, and that the description in the affidavit is for that property without the dwelling.

As stated above, the fact that a description of property contained in a search warrant is erroneous does not invalidate the warrant. *United States v. DePugh*, 452 F.2d at 920. The warrant describes the county and state where the property is located, and states that Musson is the owner of the property. The affidavit, prepared by agent Smith states that "I personally checked the Fall River County Register of Deeds records and determined the above property is in William Musson's name. I have been to the above-described property and found only one residence at this location. It is a single story residence." Agent Smith testified at the evidentiary hearing that he went to the property on at least two occasions before executing the search warrant, that on one occasion he was accompanied by a local sheriff who pointed out Musson's home, and that he thought all of Musson's property was contiguous. Considering all the information contained on the face of the warrant and in the affidavit, and agent Smith's personal knowledge, this court finds that the warrant was sufficiently particular and that the search was proper.

### 1985 Search of Gary Mintz's Residence in Denver, Colorado

Plaintiff's Exhibit 9 is a search warrant authorizing a search of Gary Mintz's resi-

dence located at 100 South Dahlia Street, Denver, Colorado. The warrant was issued on January 24, 1985 and executed January 25, 1985. It was prepared and executed by DEA agent Ann Canty. The affidavit in support of the warrant is similar to the one used to support the search warrant for Musson's Hawaii home. It contains information from John Stanley, Fred Young, Robert Karler, two confidential informants and others regarding Gary Mintz's involvement with drug trafficking and money laundering. As with the affidavits described above, this affidavit included the grand jury testimony of Fred Young, information obtained in an interview with Fred Young on March 7, 1984, and information gleaned from records Fred Young obtained while he served as president of Coast Finance. Additionally, the affidavit documents some of Mintz's most recent activity. In February of 1984, Mintz was issued a check from Robert Karler's business from the proceeds of a sale of some of Musson's coins. A pen register was placed on Mintz's home phone from May 16, 1984 to July 30, 1984, and the information gained through the pen register supports the affiant's conclusion that Gary Mintz continued his association with alleged co-conspirators. The affidavit also includes information obtained from a mail cover that was placed on Mintz's mail for the month of July, 1984. Furthermore, the affidavit includes the results of a trash seizure. On January 16, 1985, two special agents seized five trash bags from Mintz's residence. Among numerous financial statements, they found two letters, one from Thomas O'Neil (who was arrested with Fred Beahm, owner of the Andalon), and the other from Gary Mintz's sister. Both letters make reference to Mintz's illegal activities. This recent information in connection with the information about Mintz's earlier activities supports agent Canty's conclusion that Gary Mintz was involved in an ongoing criminal enterprise.

Mintz first argues that the information contained in the affidavit is stale, and therefore there was no probable cause to search his home. The same analysis above regarding staleness is applicable here. Given the nature of the crimes Mintz is alleged to have committed, this court finds that the affidavit contains sufficient information to support the magistrate's finding of probable cause.

Mintz also requests that this court suppress the financial records obtained from Fred Young, and delete any reference to them from the search warrants. As discussed above, this court has determined that Fred Young was not acting on behalf of the government when he obtained the documents, and therefore his actions do not violate Mintz's right to be free from unreasonable searches and seizures under the fourth amendment. Nor do these records need to be suppressed on the ground that the government obtained them in violation of the Financial Privacy Act, as that Act is not applicable to the facts of this case, and even if it were, the remedy for a violation of it does not include suppression of evidence.

Mintz also challenges the seizure of his trash, claiming that he has a reasonable expectation of privacy in the trash and in the area from which the trash was seized. Agent Canty seized three bags of trash from the sidewalk in front of Mintz's house on June 1, 1984. On January 16, 1985, special agents Price and D'Allissio seized five bags of garbage from the front of Mintz's home, finding the items described above. Agent Price testified at the evidentiary hearing that the bags seized were on the sidewalk in front of Mintz's home. Plaintiff's Exhibits 17 and 18, identified by agent Price, show where the garbage was seized from.

■ A person has no reasonable expectation of privacy in property abandoned for garbage removal. *United States v. Kramer*, 711 F.2d 789, 792–3 (7th Cir.1983); *United States v. Vahalik*, 606 F.2d 99, 100–01 (5th Cir.1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765; *United States v. Grabow*, 621 F.Supp. 787, 793–94 (D.C. Colo.1985). As established at the evidentiary hearing, Mintz's garbage was seized from the sidewalk in front of his home where he had placed it for removal.

Accordingly, seizure of the garbage did not infringe upon Mintz's fourth amendment protections.

Finally, Mintz moves to suppress evidence obtained by the mail cover which ran during the month of July, 1984. As discussed above in connection with Musson, reference to evidence obtained from the mail cover need not be deleted from the affidavit. Nor shall any evidence obtained pursuant to the mail cover be suppressed.

### 1985 Search of William Van Nuys' Home in Long Beach, California

Plaintiff's Exhibit 3 is a search warrant authorizing a search of William Van Nuys' residence in Long Beach, California. The warrant was issued April 11, 1985, and the affidavit in support of it is virtually identical to the affidavit in support of the 1985 Coast Finance search warrant discussed above. The affidavit includes information obtained from Fred Young, John Stanley, confidential informants, and the searches of William Musson's properties and Gary Mintz's home.

Van Nuys argues that all the information in the affidavit obtained from records provided by Fred Young be excised from the affidavit, since the government, in obtaining stolen documents from Fred Young, engaged in a prior illegal act, the fruits of which cannot be relied upon to establish probable cause in the affidavit. This court has concluded that the government did not engage in any prior illegal conduct in obtaining the records and, accordingly, information obtained from the records shall not be excised from the affidavit.

Van Nuys' principal attack on the search warrant affidavit is that the information contained in it is too stale to support a finding of probable cause. Van Nuys argues that the only reference in the affidavit to any recent activity involves surveillance of his home. As discussed above with respect to the 1985 Coast Finance search warrant and affidavit, this argument is without merit. There are numerous references to Van Nuys' involvement in narcotics trafficking and money launder-

ing throughout the affidavit. In particular, the affidavit states that evidence showing such involvement was obtained from the searches of Musson's properties and Mintz's home. Moreover, on April 11, 1985, a DEA agent observed Van Nuys leave his home and go to his Coast Finance office. Based on all the information contained in the affidavit, and in light of the criminal activity Van Nuys allegedly participated in, it was not unreasonable for the magistrate to conclude that there was probable cause that Van Nuys' home would contain evidence of narcotics trafficking and money laundering.

### 1985 Search of Safe Deposit Box at the Bank of America, Long Beach, California

On April 15, 1985, a search warrant was issued authorizing a search of a safe deposit box at the Bank of America in Long Beach, California. The search warrant incorporates by reference the affidavits used to support the warrant for the 1985 search of Coast Finance and the search of Van Nuys' home. Additionally, the affidavit includes information obtained from the search of Van Nuys' home which occurred three days prior to the date this affidavit was made. When Van Nuys' home was searched, a safe deposit key was found with a number on it, as well as lettering, indicating that it was from the Bank of America. Documents from the Bank of America showed that Van Nuys had a rare coin collection valued at $1,000,000.

Van Nuys attacks the search on the ground that the search warrant affidavit contains information too stale to support a finding of probable cause. While some of the information in the affidavit related to events occurring several years earlier, some of the information had been obtained only a few days earlier. Based on all the information in the affidavit, and in light of the criminal activity being investigated, it was reasonable for the magistrate to conclude that the safe deposit box would contain evidence of narcotics trafficking and money laundering. Therefore, evidence obtained pursuant to the search of the safe deposit box shall not be suppressed.

*516 Maple Leaf Gold Coins*

On February 6, 1985, 516 gold coins were seized from Musson as he was leaving a coin shop in Beverly Hills, California. The agents who seized the coins did not have a search warrant. Musson argues that the coins were seized illegally and should be suppressed as evidence and returned to him. This court finds that the coins were seized without a warrant and that the seizure was illegal. Accordingly, the coins should be suppressed as evidence. However, these same coins are the subject of a civil forfeiture complaint, 86–M–1031, and continue to be subject to forfeiture in this criminal case pursuant to this court's order of November 6, 1985.

Upon the foregoing, it is

ORDERED, that defendant Musson's motion to suppress the 516 maple leaf gold coins as evidence is granted, and it is

FURTHER ORDERED, that all other defendants' motions to suppress are denied.